1  MORGAN, LEWIS & BOCKIUS LLP
   Carla B. Oakley, Bar No. 130092
2  Lindsey M. Shinn, Bar No. 267629
   One Market, Spear Street Tower
3  San Francisco, CA  94105-1126
   carla.oakley@morganlewis.com
4  lindsey.shinn@morganlewis.com
   Tel: 415.442.1000
5  Fax: 415.442.1001

6  Ehsun Forghany, Bar No. 302984
   1400 Page Mill Road
7  Palo Alto, CA  94304-1124
   Ehsun.forghany@morganlewis.com
8  Tel: 650.843.4000
   Fax: 650.843.4001
9
   Attorneys for Defendants
10 Milk Moovement, Inc. and Milk
   Moovement LLC, and Counterclaim-
11 Plaintiff Milk Moovement, Inc.

12            **UNITED STATES DISTRICT COURT**

13            **EASTERN DISTRICT OF CALIFORNIA**

14 DAIRY, LLC, a Delaware Limited      | Case No. 2:21-cv-02233-WBS-AC
   Liability Company,
15                                       The Honorable William B.
                                              Shubb
16            Plaintiff,
17        vs.                          **MILK MOOVEMENT, INC.'S AND
                                       MILK MOOVEMENT LLC'S ANSWER
18 MILK MOOVEMENT, INC., a foreign     TO FIRST AMENDED COMPLAINT
   Corporation, and Milk Moovement     AND MILK MOOVEMENT, INC.'S
19 LLC, a Delaware Limited             COUNTERCLAIMS**
   Liability Company,
20                                     JURY TRIAL DEMANDED
              Defendants.
21 MILK MOOVEMENT, INC., a foreign
   Corporation,
22
              Counterclaim-
23            Plaintiff,
24        vs.
25 DAIRY, LLC, a Delaware Limited
   Liability Company,
26
              Counterclaim-
27            Defendant.
28

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1                    i          DEFENDANTS' ANSWER TO FAC AND
                                                 MMI'S COUNTERCLAIMS
                                                 2:21-CV-02233-WBS-AC

1     **MILK MOOVEMENT'S ANSWER TO DAIRY'S FIRST AMENDED COMPLAINT**

2        Defendants Milk Moovement, Inc. ("MMI") and Milk Moovement

3 LLC (collectively, "Milk Moovement"), by and through their

4 undersigned counsel, hereby respond to Plaintiff Dairy, LLC's

5 ("Dairy" or "Plaintiff") First Amended Complaint ("FAC").  Milk

6 Moovement denies all allegations in the FAC that are not

7 expressly admitted below.  Milk Moovement denies that Dairy is

8 entitled to the requested relief or any other relief.

9               **NATURE OF THE ACTION**

10     1.   Paragraph 1 consists of legal conclusions, not factual

11 allegations, and no response is required.  Milk Moovement

12 acknowledges that Dairy purports to allege the claims identified

13 in paragraph 1.  Milk Moovement otherwise denies the allegations

14 of paragraph 1.

15     2.   Milk Moovement is without sufficient knowledge or

16 information to form a belief as to the truth or falsity of the

17 allegations of paragraph 2 of the FAC, and therefore denies the

18 same.

19     3.   Milk Moovement admits that the dairy industry is

20 regulated in the United States.  Milk Moovement admits the

21 allegations in sentences two through four.  Milk Moovement admits

22 that Federal Milk Marketing Orders ("FMMOs") establish rules for

23 when milk must be pooled, when pooling is optional and how much

24 milk can be pooled from a particular facility for a given month.

25 Except as expressly admitted, Milk Moovement denies the

26 allegations in paragraph 3.

27     4.   Milk Moovement is without sufficient knowledge or

28 information to form a belief as to the truth or falsity of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

1

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   allegations of paragraph 4, and therefore denies the same.

2   5.   Milk Moovement admits that MMI is a Canadian company

3   founded in 2018, and that MMI provides cloud-based software

4   solutions to the dairy industry.   Milk Moovement denies the

5   remaining allegations in paragraph 5.

6   6.   Milk Moovement denies the allegations contained in

7   paragraph 6.

8   7.   Milk Moovement denies the allegations contained in

9   paragraph 7.

10   8.   Milk Moovement denies the allegations contained in

11   paragraph 8.

12                               **PARTIES**

13   9.   Milk Moovement is without sufficient knowledge or

14   information to form a belief as to the truth or falsity of the

15   allegations of paragraph 9, and therefore denies the same.

16   10.   Milk Moovement admits that MMI is a Canadian

17   corporation organized under the Canada Business Corporations Act,

18   with its principal place of business located at 1505 Barrington

19   Street, Suite 0100, Halifax, Nova Scotia.

20   11.   Milk Moovement admits that Milk Moovement LLC is a

21   limited liability company organized and existing under the laws

22   of the State of Delaware, with its principal place of business

23   located at 370 Wabasha St. N., Saint Paul, Minnesota 55102.   Milk

24   Moovement admits that Milk Moovement LLC is a foreign limited

25   liability company with a home jurisdiction of Nova Scotia.   Milk

26   Moovement denies the remaining allegations in paragraph 11.

27                       **JURISDICTION AND VENUE**

28   12.   Paragraph 12 consists of legal conclusions, not factual

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

2

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  allegations, and no response is required.  Milk Moovement

2  acknowledges that Dairy contends that this Court has subject

3  matter jurisdiction over its purported federal trade secret claim

4  generally under 28 U.S.C. § 1331 and supplemental jurisdiction

5  over the remaining claims under 28 U.S.C. § 1367.  To the extent

6  a further response is required, Milk Moovement denies the

7  allegations in paragraph 12.

8    13.  Paragraph 13 consists of legal conclusions, not factual

9  allegations, and no response is required.  Milk Moovement

10  acknowledges that Dairy contends that the Court has personal

11  jurisdiction over both named defendants.  For purposes of the

12  claims asserted in the FAC, Milk Moovement does not contest that

13  MMI and Milk Moovement LLC are subject to this Court's personal

14  jurisdiction.  To the extent that a further response is required,

15  Milk Moovement denies the allegations in paragraph 13.

16    14.  Paragraph 14 consists of legal conclusions, not factual

17  allegations, and no response is required.  Milk Moovement

18  acknowledges that Dairy contends that venue is proper.  For

19  purposes of the claims asserted in the FAC, Milk Moovement does

20  not contest that venue is proper in this District.  Milk

21  Moovement is without sufficient knowledge or information to form

22  a belief as to the truth or falsity of the allegations regarding

23  the principal place of business of California Dairies, Inc.

24  ("CDI"), and therefore denies the same.  Milk Moovement denies

25  the remaining allegations of paragraph 14.

26                              **FACTS**

27    15.  Milk Moovement denies the allegation that the time,

28  money, and expertise required to develop a software platform that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1                    3                    DEFENDANTS' ANSWER TO FAC AND
                                                        MMI'S COUNTERCLAIMS
                                                        2:21-CV-02233-WBS-AC

1  allows participants in the U.S. dairy industry to comply with
2  applicable regulations is a significant barrier to entry into the
3  U.S. dairy supply chain software market.  Milk Moovement is
4  without sufficient knowledge or information to form a belief as
5  to the truth or falsity of the remaining allegations of paragraph
6  15, and therefore denies the same.

7      16.  Milk Moovement admits that Dairy's software is used by
8  entities, such as milk processors and dairy cooperatives, and
9  that dairy cooperatives, like CDI, are entities owned by their
10  farmer-members.  Milk Moovement is without sufficient knowledge
11  or information to form a belief as to the truth or falsity of the
12  remaining allegations of paragraph 16, and therefore denies the
13  same.

14      17.  Milk Moovement admits that providers of supply chain
15  software for the U.S. dairy industry must understand--and ensure
16  that their software accounts for--U.S. dairy regulations.  Milk
17  Moovement further admits that U.S. dairy prices are regulated
18  through sets of regulations known as Federal Milk Marketing
19  Orders ("FMMOs").  Milk Moovement is without sufficient knowledge
20  or information as to "pricing regimes in all of U.S. agriculture"
21  to form a belief as to the truth or falsity of the third sentence
22  of paragraph 17, and therefore denies the same.  Milk Moovement
23  denies the remaining allegations of paragraph 17.

24      18.  Milk Moovement admits the allegations contained in the
25  first three sentences of paragraph 18.  Milk Moovement further
26  admits that not "paying into the pool" avoids a direct cost and
27  provides handlers with flexibility in making payments at
28  different points in the cycle.  Except as expressly admitted,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    Milk Moovement denies the allegations of paragraph 18.

2        19.  Milk Moovement admits the allegations contained in the

3    first and third sentences of paragraph 19.  Milk Moovement

4    further admits that handlers may be able to elect whether to

5    participate in the pool with respect to other classes of milk,

6    depending on and consistent with other FMMO regulations.  Milk

7    Moovement denies the remaining allegations of paragraph 19.

8        20.  Milk Moovement admits that parties make pooling

9    decisions based on particular information.  Milk Moovement admits

10   that the FMMO impose rules surrounding milk pooling.  Milk

11   Moovement further admits the allegations contained in the third

12   sentence of paragraph 20.  Milk Moovement denies the remaining

13   allegations of paragraph 20.

14       21.  Milk Moovement admits the allegations contained in

15   paragraph 21.

16       22.  Milk Moovement admits that Dairy's software can be used

17   to generate reports that may be used in the FMMO compliance

18   process.  Milk Moovement is without sufficient knowledge or

19   information to form a belief as to the truth or falsity of the

20   remaining allegations of paragraph 22, and therefore denies the

21   same.

22       23.  The allegation that Dairy's software includes and

23   implements a methodology that is a trade secret is a legal

24   conclusion that does not require a response; to the extent a

25   response is required, Milk Moovement is without sufficient

26   knowledge or information to form a belief as to the truth or

27   falsity of the allegation and therefore denies same.  Milk

28   Moovement is without sufficient knowledge or information to form

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

5

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   a belief as to the truth or falsity of the remaining allegations

2   of paragraph 23, and therefore denies the same.

3       24.  The allegations in Paragraph 24 are opinion and

4   argument and require no response; to the extent a response is

5   required, Milk Moovement is without sufficient knowledge or

6   information to form a belief as to the truth or falsity of the

7   allegations of paragraph 24, and therefore denies the same.

8       25.  Milk Moovement is without sufficient knowledge or

9   information to form a belief as to the truth or falsity of the

10  allegations of paragraph 25, and therefore denies the same.

11      26.  Paragraph 26 consists of legal conclusions, not factual

12  allegations, and no response is required.  Milk Moovement denies

13  that Dairy takes reasonable measures to protect the secrecy and

14  confidentiality of its alleged trade secrets.  Milk Moovement is

15  without sufficient knowledge or information to form a belief as

16  to the truth or falsity of the remaining allegations of

17  paragraph 26, and therefore denies the same.

18      27.  Milk Moovement is without sufficient knowledge or

19  information to form a belief as to the truth or falsity of the

20  allegations of paragraph 27, and therefore denies the same.

21      28.  Milk Moovement is without sufficient knowledge or

22  information to form a belief as to the truth or falsity of the

23  allegations of paragraph 28, and therefore denies the same.

24      29.  Milk Moovement is without sufficient knowledge or

25  information to form a belief as to the truth or falsity of the

26  allegations of paragraph 29, and therefore denies the same.

27      30.  Paragraph 30 consists of legal conclusions, not factual

28  allegations, and no response is required.  Milk Moovement states

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

6

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    that it has never seen the contract between Dairy and CDI, but

2    Milk Moovement admits that Dairy's purported "standard User

3    Agreement Terms and Conditions" attached as Exhibit 1 to the FAC

4    purports to contain certain restrictions and confidentiality

5    requirements.  Milk Moovement denies the allegation that MMI

6    requires customers to maintain the confidentiality of the

7    software and any output from the software, and denies that

8    "Confidential Information" as defined in the attached User

9    Agreement includes the items listed in the last sentence of

10   paragraph 30.  Milk Moovement is without sufficient knowledge or

11   information to form a belief as to the truth or falsity of the

12   remaining allegations of paragraph 30, and therefore denies the

13   same.

14       31.  The allegation in paragraph 31 that the quoted

15   provisions restrict use of and access to Dairy's producer payroll

16   application and use and disclosure of Dairy's Confidential

17   Information is a legal conclusion, to which no response is

18   required.  Milk Moovement states further that the listing of

19   quoted language is incomplete and misleading, and therefore

20   denies same.  As to the remaining allegations, to the extent a

21   further response is required, Milk Moovement is without

22   sufficient knowledge or information to form a belief as to the

23   truth or falsity of the remaining allegations of paragraph 31,

24   and therefore denies the same.

25       32.  Milk Moovement admits the allegations contained in

26   paragraph 32.

27       33.  Milk Moovement acknowledges that CDI previously engaged

28   with Dairy for software services prior to its engagement of MMI.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

7

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   Milk Moovement has never seen the contract between Dairy and CDI.

2   Milk Moovement is without sufficient knowledge or information to

3   form a belief as to the truth or falsity of the allegations of

4   paragraph 33, and therefore denies the same.

5        34.  Milk Moovement admits the allegations contained in

6   paragraph 34.

7        35.  Milk Moovement admits that CDI used Dairy's software

8   during the time that California was transitioning to the

9   California FMMO.  Milk Moovement further admits that CDI licensed

10  Dairy's producer payroll application to manage the financial data

11  to pay its member-owners for milk produced.  Milk Moovement

12  denies that CDI licensed Dairy's producer payroll application to

13  make pooling decisions.  Milk Moovement is without sufficient

14  knowledge or information to form a belief as to the truth or

15  falsity of the allegations of paragraph 35, and therefore denies

16  the same.

17       36.  Milk Moovement is without sufficient knowledge or

18  information to form a belief as to the truth or falsity of the

19  allegations of paragraph 36, and therefore denies the same.

20       37.  Milk Moovement admits that during MMI's discussions

21  with CDI regarding MMI's software capabilities, CDI informed MMI

22  that it used Dairy's software.  Milk Moovement denies the

23  remaining allegations in paragraph 37.

24       38.  Milk Moovement admits that MMI issued a press release

25  on April 15, 2021, noting that it had secured $3.2 million USD in

26  seed funding and planned to expand its business across the United

27  States as interest and demand for its software continued to grow.

28  Except as expressly admitted, Milk Moovement denies the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

8

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  allegations of paragraph 38.

2      39.  MMI had customers for its producer payroll application

3  outside the U.S. prior to beginning discussions with CDI, but

4  Milk Moovement admits that MMI did not have U.S.-based customers

5  for its producer payroll application at that time.  Milk

6  Moovement denies the remaining allegations in paragraph 39.

7      40.  Milk Moovement admits that MMI engaged in discussions

8  with CDI about CDI's needs and MMI's capabilities throughout the

9  spring and summer of 2021.  Milk Moovement admits that MMI

10  discussed with CDI what kind of reporting CDI needed.  Except as

11  expressly admitted, Milk Moovement denies the allegations in

12  paragraph 40.

13      41.  Milk Moovement admits that MMI entered into a software

14  and services agreement with CDI in September 2021.  Milk

15  Moovement is without sufficient knowledge or information to form

16  a belief as to the truth or falsity of the remaining allegations

17  of paragraph 41, and therefore denies the same.

18      42.  Milk Moovement is without sufficient knowledge or

19  information to form a belief as to the truth or falsity as to

20  when CDI provided its termination notice to Dairy.  Milk

21  Moovement denies that CDI and Milk Moovement had a call where

22  they discussed confidential and trade secret information

23  regarding Dairy's producer payroll application and reporting

24  capabilities.  Milk Moovement admits that MMI asked CDI to share

25  reports that CDI generated with any modifications CDI manually

26  made to them, and that CDI had identified that reflected CDI's

27  own data, which it routinely provides to third parties, including

28  federal dairy regulators and its own customers.  Milk Moovement

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

9

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  further admits that CDI shared reports, with any manual

2  modifications, containing CDI's own data and that CDI explained

3  how CDI used this data for its own business.  Except as expressly

4  admitted, Milk Moovement denies the allegations of paragraph 42.

5       43.  Milk Moovement denies the allegations in the first

6  sentence of paragraph 43.  As to the second sentence of

7  paragraph 43, Milk Moovement admits that is common in the dairy

8  supply chain software industry for parties to restrict access to

9  source code.  Milk Moovement denies that it is common in the

10  dairy supply chain software industry to require customers to keep

11  software output confidential.  Milk Moovement is without

12  sufficient knowledge or information to form a belief as to the

13  truth or falsity of the remaining allegations of the second

14  sentence of paragraph 43, and therefore denies the same.  The

15  third sentence of paragraph 43 consists of argument and requires

16  no response; to the extent a response is required, Milk Moovement

17  denies the allegations.

18       44.  Milk Moovement denies the allegations of paragraph 44.

19       45.  Milk Moovement denies the allegations in the first

20  sentence of paragraph 45.  As to the second sentence of

21  paragraph 45, Milk Moovement is without sufficient knowledge or

22  information to form a belief as to the truth or falsity of the

23  allegations, and therefore denies the same.

24       46.  Milk Moovement denies the allegations contained in

25  paragraph 46.

26       47.  Milk Moovement states that MMI had a fully operational

27  producer payroll application in 2018, thus Milk Moovement denies

28  that MMI's producer payroll application was not fully operational

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

10

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   until February 2022.  Milk Moovement admits that MMI agreed to

2   have CDI onboarded and fully integrated into the MMI platform,

3   with all applicable customizations, by February 2022, and that

4   this was intended to coincide with the termination of CDI's

5   access to Dairy's entire software platform.  Except as expressly

6   admitted, Milk Moovement denies the remaining allegations in

7   paragraph 47.

8        48.  Milk Moovement denies the allegations contained in

9   paragraph 48.  MMI had a fully functional producer payroll

10  application in 2018.  Milk Moovement states further that MMI's

11  producer payroll application had the capability to take in price

12  inputs and multiply those price inputs by pounds to output a

13  rate, regardless of whether the prices were provided by a FMMO.

14       49.  Milk Moovement denies the allegations contained in

15  paragraph 49.

16       50.  Milk Moovement admits that CDI required a producer

17  payroll application and that CDI had to comply with the FMMO.

18  Milk Moovement further states that CDI did not use Dairy's

19  software to make the pickup level pooling decisions that were

20  part of its FMMO compliance.  Except as expressly admitted, Milk

21  Moovement denies the allegations contained in paragraph 50.

22       51.  Milk Moovement denies the allegations contained in

23  paragraph 51.

24       52.  Milk Moovement denies the allegations contained in

25  paragraph 52.

26       53.  Milk Moovement denies the allegations contained in

27  paragraph 53.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1

**COUNT ONE**

2

**Misappropriation of Trade Secrets in Violation of the DTSA, 18**

3

**U.S.C. § 1836 *et seq.***

4      54.  In response to paragraph 54, Milk Moovement restates

5   its responses to paragraphs 1 through 53.

6      55.  To the extent that paragraph 55 consists of legal

7   conclusions, not factual allegations, no response is required.

8   Milk Moovement is without sufficient knowledge or information to

9   form a belief as to the truth or falsity of the allegations in

10   paragraph 55, and therefore denies the same.

11      56.  To the extent that paragraph 56 consists of legal

12   conclusions, not factual allegations, no response is required.

13   Milk Moovement is without sufficient knowledge or information to

14   form a belief as to the truth or falsity of the allegations of

15   paragraph 56, and therefore denies the same.

16      57.  To the extent that paragraph 57 consists of legal

17   conclusions, not factual allegations, no response is required.

18   Milk Moovement denies that the User Agreement attached as

19   Exhibit 1 to the FAC prohibits sharing of the outputs of Dairy

20   software or all reverse engineering.  Milk Moovement is without

21   sufficient knowledge or information to form a belief as to the

22   truth or falsity of the remaining allegations of paragraph 57,

23   and therefore denies the same.

24      58.  Milk Moovement denies the allegations contained in

25   paragraph 58.

26      59.  Milk Moovement denies the allegations contained in

27   paragraph 59.

28      60.  Milk Moovement denies the allegations contained in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

12

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  paragraph 60.

2      61.  Milk Moovement denies the allegations contained in

3  paragraph 61.

4      62.  Milk Moovement acknowledges that Dairy seeks injunctive

5  relief in addition to damages.  Milk Moovement denies the

6  allegations contained in paragraph 62, including that injunctive

7  relief is necessary or that damages are warranted.

8                         **COUNT TWO**

9  **Misappropriation of Trade Secrets in Violation of CUTSA, Cal.**

10             **Civ. Code § 3426.1 *et seq.***

11     63.  In response to paragraph 63, Milk Moovement restates

12  its responses to paragraphs 1 through 62.

13     64.  Milk Moovement admits that MMI and Milk Moovement LLC

14  are "Persons" under Cal. Civ. Code § 3426.1(c).

15     65.  To the extent that paragraph 65 consists of legal

16  conclusions, not factual allegations, no response is required.

17  Milk Moovement is without sufficient knowledge or information to

18  form a belief as to the truth or falsity of the allegations in

19  paragraph 65, and therefore denies the same.

20     66.  To the extent that paragraph 66 consists of legal

21  conclusions, not factual allegations, no response is required.

22  Milk Moovement denies that the User Agreement attached as

23  Exhibit 1 to the FAC prohibits sharing of the outputs of Dairy

24  software or all reverse engineering.  Milk Moovement is without

25  sufficient knowledge or information to form a belief as to the

26  truth or falsity of the remaining allegations of paragraph 66,

27  and therefore denies the same.

28     67.  Milk Moovement denies the allegations contained in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1                              13
DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   paragraph 67.

2       68.  Milk Moovement denies the allegations contained in

3   paragraph 68.

4       69.  Milk Moovement denies the allegations contained in

5   paragraph 69.

6       70.  Milk Moovement denies the allegations contained in

7   paragraph 70.

8       71.  Milk Moovement acknowledges that Dairy seeks injunctive

9   relief in addition to damages.  Milk Moovement denies the

10  allegations contained in paragraph 71, including that injunctive

11  relief is necessary or that damages are warranted.

12                          **COUNT THREE**

13  **California Common Law Intentional Interference with Contractual**

14                          **Relations**

15      72.  In response to paragraph 72, Milk Moovement restates

16  its responses to paragraphs 1 through 71.

17      73.  Milk Moovement admits that CDI licensed Dairy's

18  producer payroll application.  Milk Moovement denies that Dairy's

19  User Agreement attached as Exhibit 1 to the FAC restricts a

20  customer's ability to use, disclose, and access its own data.

21  Milk Moovement is without sufficient knowledge or information to

22  form a belief as to the truth or falsity of the remaining

23  allegations of paragraph 73, and therefore denies the same.

24      74.  Milk Moovement denies the allegations contained in

25  paragraph 74.

26      75.  Milk Moovement denies the allegations contained in

27  paragraph 75.

28      76.  Milk Moovement denies the allegations contained in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

14

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   paragraph 76.

2        77.  Milk Moovement denies the allegations contained in

3   paragraph 77.

4        78.  Milk Moovement denies the allegations contained in

5   paragraph 78.

6        79.  Milk Moovement denies the allegations contained in

7   paragraph 79.

8                          **RELIEF REQUESTED**

9        Milk Moovement denies any factual assertions and underlying

10  allegations contained in Dairy's request for relief.  Milk

11  Moovement further denies that Dairy is entitled to any of the

12  relief requested.

13                        **AFFIRMATIVE DEFENSES**

14       Milk Moovement asserts the following affirmative defenses in

15  response to Dairy's FAC:

16                     **First Affirmative Defense**

17       Dairy's claims are barred by the doctrine of waiver.

18       For example, while Dairy has alleged that CDI improperly

19  shared with Milk Moovement certain spreadsheet reports that CDI

20  had pulled from Dairy's software, Dairy itself has admitted that

21  "some of these reports are not always kept in CDI's sole

22  possession, as they are sometimes shared with CDI's customers to

23  support CDI's sales activities."

24       As another example, while Dairy has alleged that CDI is not

25  allowed to share the spreadsheet reports with Dairy's

26  competitors, at least one Dairy employee knowingly shared a CDI

27  report pulled from Dairy's software platform with MMI.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

15

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1

**Second Affirmative Defense**

2        Dairy's claims are barred by the doctrines of estoppel and

3   unclean hands.

4        For example, while Dairy has alleged that Milk Moovement

5   committed trade secret misappropriation when it received from CDI

6   certain reports pulled from Dairy's software to facilitate CDI's

7   transition to Milk Moovement, Dairy itself had received similar

8   information from CDI when CDI was transitioning from its old

9   service provider to Dairy.  Indeed, when CDI terminated its

10  software service agreement with its old provider and transitioned

11  to Dairy, CDI provided Dairy with access to CDI's data -- the

12  same or similar data CDI supplied to MMI -- that was directly

13  derived from the excel spreadsheets and reports obtained from the

14  existing system.  CDI provided its information to Dairy to ensure

15  that Dairy possessed the information and formatting CDI required

16  to help facilitate the transition.  The spreadsheet reports

17  identified by Dairy as trade secrets are the same-in all material

18  respects-as those reports from the system CDI used prior to its

19  transition to Dairy.

20

**Third Affirmative Defense**

21       Dairy's claims fail as they are barred by the terms of the

22  applicable User Agreement between Dairy and CDI.

23       For example, despite Dairy's conclusory allegations to the

24  contrary, the User Agreement does not prohibit CDI from providing

25  spreadsheet reports of CDI's own data to Milk Moovement.  The

26  term "Confidential Information" is defined in the User Agreement

27  as follows:

28       "Confidential Information" shall mean any and all Setup

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

16

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1            Information, Transaction Information, Access Codes,

2            Licensed Materials, Documentation, Software, Content,

3            Modules, Configured Data, the configuration of the

4            Configured Data, flow charts, processes, prototypes,

5            sales information, know-how, trade secrets, documents,

6            third-party software licensed with or as a part of the

7            Licensed Materials or any other data relating thereto,

8            provided by one party to the other hereunder, either

9            orally, in writing, or electronically (via email, text

10           message or over the Internet).  Confidential

11           Information shall also specifically include

12           communications made by Dairy.com's employees or agents

13           to User, or its Representatives, either orally, in

14           writing, or electronically (via email, text message or

15           over the Internet).

16    "Confidential Information" thus covers only information that is

17    "provided by one party to the other," and includes CDI's

18    confidential information over which Dairy can claim no rights.

19    For example, "Setup Information," "Transaction Information" and

20    "Configured Data" are all defined as the customer's("User's")

21    data.  The definition does not say that all "output" from the

22    software is Dairy's Confidential Information, as Dairy alleges.

23    Dairy is therefore left to argue that the reports CDI gave to MMI

24    are "Configured Data," "configurations of Configured Data," or

25    "documents."  But "Configured Data," by definition, is CDI's

26    Confidential Information. Likewise, any "configurations" of CDI's

27    own Configured Data that CDI generated to provide to dairy

28    farmers, federal regulators and to otherwise meet CDI's business

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

17

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    needs likewise constitutes CDI's Confidential Information.

2                    **Fourth Affirmative Defense**

3        Dairy's claims in Counts I and II fail because Dairy failed

4    to undertake reasonable measures to maintain the secrecy of the

5    alleged trade secret information.

6        For example, Dairy has not undertaken reasonable measures to

7    restrict users from sharing spreadsheet reports pulled from

8    Dairy's software platform with third parties, nor would it have

9    been reasonable to do so.  Quite the opposite; Dairy admits that

10   "some of these reports are not always kept in CDI's sole

11   possession, as they are sometimes shared with CDI's customers to

12   support CDI's sales activities."

13       As another example, when the excel spreadsheet reports are

14   pulled from Dairy's software platform, no confidentiality legends

15   are affixed to them.

16                     **Fifth Affirmative Defense**

17       Dairy's claims in Counts I and II fail because Milk

18   Moovement did not use any of Dairy's trade secret information.

19       For example, despite Dairy's conclusory allegations to the

20   contrary, CDI never used Dairy's software platform to make "pick-

21   up level pooling" decisions.  Rather, CDI made its own pooling

22   decisions using its own spreadsheet with CDI's proprietary

23   algorithms, wholly separate from Dairy's software platform.

24       As another example, despite alleging that Milk Moovement

25   incorporated into its software platform Dairy's pick-up level

26   pooling methodology, MMI's software platform neither implements

27   any pick-up level pooling functionality of the type alleged by

28   Dairy to have been misappropriated, nor uses any pick-up level

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1
18
DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   pooling methodologies to make pick-up level pooling decisions for

2   CDI or any other customer.

3                          **Sixth Affirmative Defense**

4       Dairy's claims in Counts I and II fail because MMI

5   independently developed its own producer payroll application and

6   FMMO compliance software.

7       For example, despite Dairy's conclusory allegations to the

8   contrary, the *Loads by Plant and FO* report is a commonly

9   generated report that MMI designed and implemented before working

10  with CDI.  Similarly, MMI developed the *Pickups for Date Range*

11  report prior to receiving CDI's reports.  The reports are simply

12  an exportable version of the pickups table in MMI's application

13  and were part of MMI's platform before it began working with CDI.

14                        **Seventh Affirmative Defense**

15      Dairy's claims in Counts I and II fail because the alleged

16  trade secrets that Dairy claims were misappropriated are

17  comprised of information that does not constitute a trade secret.

18      For example, despite Dairy's allegations to the contrary, it

19  is well-known in the industry that the spreadsheet reports

20  identified by Dairy as its trade secrets are standard reports

21  commonly shared amongst a users' customers and its providers.

22  Most dairy companies use spreadsheet reports very similar to

23  those identified by Dairy as its trade secrets.  Indeed, MMI

24  generated comparable reports from its systems well before

25  receiving any reports from CDI.  The reports are of the type

26  regularly provided to customers without confidentiality

27  restrictions.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

19

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1

### Eighth Affirmative Defense

2      Dairy's claim in Count III fails to the extent that it is

3 superseded by the California Uniform Trade Secrets Act.

4

### Ninth Affirmative Defense

5      Dairy's claim in Count III fails because CDI terminated its

6 contract with Dairy on September 17, 2021, before Milk Moovement

7 committed the alleged act of tortious interference — namely,

8 requesting and receiving Dairy's confidential information from

9 CDI.

10

### Tenth Affirmative Defense

11      Dairy's claim in Count III is barred, in whole or in part,

12 because the contract between Dairy and CDI was terminable at will

13 and Milk Moovement did not engage in any independently wrongful

14 act.

15      For example, Section 10.2 of the Agreement, titled

16 "Termination of Entire Orders or Specific Services," states in

17 relevant part that the Agreement "may be terminated for

18 Convenience by either party … at any time, upon thirty (30) days

19 written notice, and by immediately paying a termination fee …."

20 As another example, Dairy itself threatened to terminate CDI's

21 access to Dairy's software immediately in a December 31, 2021,

22 letter to CDI.  Thus, Milk Moovement cannot be liable for

23 tortious interference with contract unless it engaged in an

24 independently wrongful apart.  But Milk Moovement did not engage

25 in any independently wrongful conduct.  The only provision Dairy

26 alleges that CDI breached was an obligation "to keep the entire

27 Dairy software suite confidential," and the only conduct that

28 Dairy alleges caused CDI to breach this obligation was MMI's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

DB2/ 43092452.1

"request[] that CDI provide it with confidential, non-trade secret information about the structure, functionality, and operation of Dairy's software."  Milk Moovement's alleged trade secret misappropriation cannot qualify as an independent wrongful act without rendering its claim superseded by CUTSA.

### Eleventh Affirmative Defense

Dairy's claims fail because Dairy has not suffered any damages as a result of Milk Moovement's alleged conduct referred to in the FAC; thus, Dairy is not entitled to any relief.

### Twelfth Affirmative Defense

Dairy's claims for damages are barred, in whole or in part, because the purported damages are speculative or uncertain.

### Thirteenth Affirmative Defense

Dairy's claims are barred, in whole or in part, due to its own conduct, acts, and omissions, including the conduct, acts, and omissions alleged in MMI's Counterclaims below.

### Fourteenth Affirmative Defense

Any right of recovery Dairy claims to have suffered were not actually, proximately or materially caused by Milk Moovement's alleged conduct referred to in the FAC, and Dairy therefore should be barred from all recovery or relief.

### Fifteenth Affirmative Defense

Any right of recovery that Dairy claims to have suffered is barred, in whole or in part, to the extent that any loss, damage, or harm that Dairy has allegedly suffered or will suffer, as alleged in the FAC or otherwise, is the direct or proximate result, either in whole or in part, of Dairy's own intentional, reckless, negligent or careless conduct, including as alleged in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

21

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  MMI's Counterclaims below.

2                    **Sixteenth Affirmative Defense**

3       Dairy is not entitled to injunctive relief as it has, at a

4  minimum, an adequate remedy at law for the claims alleged in the

5  FAC and no irreparable injury.

6                    **Other Affirmative Defenses**

7       Milk Moovement has insufficient knowledge or information

8  upon which to form a belief as to whether it may have additional,

9  as yet unstated, separate defenses available.  Milk Moovement's

10 investigation into the FAC is ongoing, and Milk Moovement

11 therefore reserves the right to plead any other appropriate and

12 additional defenses that discovery or further legal analysis may

13 reveal during the course of this litigation.

14         **MILK MOOVEMENT, INC.'S COUNTERCLAIMS AGAINST DAIRY**

15      1.   For its counterclaims against Dairy, Counterclaim-

16 Plaintiff Milk Moovement Inc. ("MMI") alleges as follows:

17                            **PARTIES**

18      2.   MMI is a Canadian corporation organized under the

19 Canada Business Corporations Act, with its principal place of

20 business located at 1505 Barrington Street, Suite 0100, Halifax,

21 Nova Scotia.

22      3.   Dairy alleges to be a limited liability company

23 organized and existing under the laws of the State of Delaware,

24 with its principal place of business at 3801 Parkwood Boulevard,

25 Suite 300, Frisco, Texas 75034.

26                     **JURISDICTION AND VENUE**

27      4.   This Court has subject matter jurisdiction over MMI's

28 counterclaims because they arise under the Federal Declaratory

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

22

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  Judgment Act, 28 U.S.C. § 2201, *et seq.*, the Lanham Act, 15

2  U.S.C. § 1051, *et seq.* and the Sherman Act, 15 U.S.C. § 2.

3  Federal subject matter jurisdiction is therefore conferred by 28

4  U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(b) (unfair

5  competition), 15 U.S.C. § 1121 (Lanham Act), and 15 U.S.C. § 2

6  (Sherman Act).  This Court has supplemental jurisdiction over

7  MMI's state-law counterclaims under 28 U.S.C. § 1367.

8       5.    Personal jurisdiction and venue in this District are

9  proper because Dairy sued MMI in this Court.

10                     **FACTUAL BACKGROUND**

11      6.    Historically, systems for tracking the dairy supply

12 chain were based on pen and paper.  These methods were time

13 consuming and prone to error.

14      7.    To help innovate and modernize the dairy supply chain

15 industry, MMI created a cloud-based software platform to connect

16 all players in the dairy supply chain, with features for

17 transportation monitoring, production tracking, quality

18 monitoring, and producer payments.

19      8.    MMI and its personnel have a long history in the dairy

20 business.

21      9.    For example, before founding MMI, co-founder and Chief

22 Product Officer, Jon King, was employed as a technical support

23 analyst for the Dairy Farmers of Newfoundland and Labrador from

24 July 2015 to January 2017.  From January 2017 to December 2019,

25 he was the Chief Operating Officer at Vinocount, a software

26 platform for inventory management.

27      10.  MMI employs several other individuals who have worked

28 at every level in the dairy industry and understand the business

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

23

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

from the dairy farm, to the milk processors, to the end customers.

11.  MMI's software is used, among other things, to keep track of how much and when milk is picked up from a farm, where the milk and trucks are while in transit, when the milk is dropped off at a processing plant, results of the quality testing (*e.g.*, determining fat, protein, lactose and other solids), payments to producers and customer invoicing.  This software can be accessed via computer or mobile app.

12.  MMI offers its clients custom portals, via computer or mobile app, so they can access their raw data--or calculations based on that raw data--in real-time and select, sort, and download their data into custom reports.  This data can be further manipulated, sorted, formatted, searched, or any other number of functions.

13.  The reports Dairy claims are trade secrets are similar to the reports containing client data that MMI has been providing to its clients since it was founded or are very standard forms similar to those used by others in the industry.  These reports often go to third parties (including producers, plants, processors, the FMMO market administrator, customers, etc.), and those third parties need to be able to easily understand the information the reports contain.

14.  MMI's platform can also be used to generate invoices or short forms that pull client data from the database and populate specified fields on the invoice or form.

15.  The payroll process for MMI's clients includes, among other features, producer revenue sections, hauling charges,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

24

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  deductions, producer pay, and bonus calculations.  Before working

2  with CDI, MMI had other clients that run payroll with its system

3  using Monthly Milk CSV, calculate their taxes, charges

4  (penalties, stop charges, hauling charges, etc.), premiums

5  (component premiums, quality bonusses, incentives, etc.), and

6  miscellaneous items (*e.g.*, equalization, one off items, etc.).

7  16.  MMI completed its first platform installation in

8  January 2018 for Dairy Farmers of Newfoundland & Labrador.

9  17.  Prior to talking with CDI about how MMI could meet

10  CDI's needs, MMI had clients in Canada and Australia and

11  experience complying with various regulatory systems.

12  18.  For example, beginning in January 2021, long before

13  receiving any information from CDI, MMI began providing a

14  producer payroll system to Riverina Fresh in Australia.

15  Riverina's producer payroll system is similar to those of any

16  U.S. client, in that the system needs to accurately track in

17  real-time the milk that is produced and delivered and calculate

18  how much producers are paid for the milk.  MMI's producer payroll

19  system that CDI is currently using is effectively the same as the

20  system MMI installed at Riverina.

21  **A.   Dairy Has Aggressively Acquired Its Competitors**

22  19.  Dairy has alleged that it has been one of the leading

23  providers of technology, services, and industry intelligence to

24  the dairy industry in the United States since 2000.  Dairy

25  advertises itself as the largest provider of dairy supply chain

26  software in the United States and has stated that 80% of the

27  Dairy companies listed on the Dairy Foods' Top 100 are served by

28  Dairy.com.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

25

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

20.   Since its founding, Dairy has aggressively eliminated potential competitors through strategic acquisitions.  By eliminating competitors who had superior software products and services through purchase, Dairy has been able to continue charging consumers supracompetitive prices for its inferior software platform and avoid incurring the necessary investment of time and resources to resolve the inherent deficiencies plaguing its platform.

21.   In 2013, for example, Dairy.com acquired Blimling and Associates Inc., a dairy consulting firm, and its two sister companies, Roger W. Blimling Inc. and Blimling Management Services Inc.  The following year, Dairy.com acquired QA Studio, a quality assurance and food traceability software provider to the dairy industry.  And in 2018, Dairy acquired Data Specialists, Inc. (DSI), which advertises that it provides producer payroll, procurement, manufacturing ERP, financial and warehouse/distribution management software.

22.   In September 2019, Dairy announced that it had been acquired by Banneker Partners, a San Francisco, California-based private investment firm that advertises that it focuses on building long-term value in software businesses through strategic acquisitions.  Following its acquisition by Banneker Partners, Dairy increased its acquisition of competing supply chain software products and services in order to further reduce competition in the market.

23.   For example, the following year, Dairy acquired majority ownership of My Dairy Dashboard, which is described publicly as a data analytics provider for dairy producers, after

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

26

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    reaching an agreement with cofounder Virtus Nutrition.  On June

2    28, 2021, Dairy announced that it had acquired ever.ag, which is

3    publicly described as a risk-management solutions provider for

4    the dairy supply chain.  This was followed in October 2021 by the

5    acquisition of Mr. Milkman, which is described publicly as a

6    last-mile dairy supply chain SaaS platform based in India.

7         24.  On information and belief, Dairy completed each of

8    these acquisitions with the goal and purpose of maintaining its

9    monopoly in the market by eliminating the threat of competition

10   from competitors, thereby suppressing competition and allowing

11   Dairy to charge supracompetitive prices.

12        **B.   After Learning that MMI Closed a $3.2 Million Seed**

13             **Funding Round to Expand into the U.S. Market, Dairy**

14             **Worked with Banneker Partners to Acquire MMI**

15        25.  Shortly after announcing its expansion into the U.S.

16   market, MMI received an email on September 30, 2020, from Kyle

17   Hufford, Vice President of Banneker Partners, stating: "I'm with

18   Banneker Partners, we're a private equity firm in San Francisco

19   and we own Dairy.com.  We've been impressed with what you guys

20   are building and noticed the recently announced move to open an

21   office in the US.  We think that there might be some interesting

22   overlaps with your on farm product and what Dairy.com does with

23   farm to plant.  I'm sure you're busy building the business but it

24   would be interesting to at least kick off a dialogue.  Are you

25   guys open for a quick intro call sometime in the next week or

26   so?"

27        26.  In response, MMI agreed to meet with Banneker Partners

28   on October 7, 2020, and thereafter demonstrated the capabilities

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

27

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1 of its software platform to Banneker Partners.  On information

2 and belief, Banneker Partners arranged the meeting with MMI and

3 requested a demonstration of MMI's capabilities to determine

4 whether MMI posed a threat to Dairy's market share and, if so,

5 eliminate that threat through a strategic acquisition.

6      27.  Following that demonstration and shortly after

7 publishing a press release announcing its $3.2 million seed

8 funding round, MMI received another email from Mr. Hufford on

9 May 21, 2021, stating: "I wanted to check in from our initial

10 conversation back in October.  I caught up with our CEO, Scott

11 Sexton at Diary.com [sic], and he thought it would be great if we

12 could set up a follow up call and have him join this time.  Do

13 you guys have some time in the next week or two? Thanks-."

14      28.  Recognizing the meeting as a pretext for an acquisition

15 by Dairy, MMI responded to Mr. Hufford that same day by turning

16 down the invitation to meet with Dairy's CEO.

17      29.  On May 24, 2021, Mr. Hufford of Banneker Partners sent

18 MMI an email response, stating: "Ok fair enough, congrats on the

19 latest capital raise and we'll check back down the road a bit."

20      **C.**   **After Flaws in Dairy's Software Platform Cost CDI**

21           **Millions in Dumping and Discounting Loads of Milk, CDI**

22           **Decided to Transition to MMI's Superior Platform**

23      30.  CDI is a milk marketing and processing cooperative co-

24 owned by more than 300 dairy families (also known as "members").

25 These members are independent, family-owned dairies located

26 throughout California.

27      31.  CDI is a leading manufacturer of butter, milk powder,

28 nutritional milk powder and fluid milk products that are sold in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

28

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  all fifty (50) states and in more than fifty (50) countries.  CDI

2  produces approximately 40% of the milk volume in California, and

3  20% of the total butter manufactured in the United States.  CDI

4  is the leading dairy processing cooperative in California, and

5  the second largest milk marketing cooperative in the United

6  States.

7      32.  Prior to 2016, CDI used an old technology for payroll

8  processing.  At the start of 2016, CDI transitioned its existing

9  data and information for payroll processing into software

10 developed by another data company.  While the existing system was

11 functional, it also required a team of CDI employees to manually

12 input certain information into the system from the paper tickets

13 that were used to track members' products.  At the same time, CDI

14 had other software needs for its business and, since some of

15 CDI's largest customers were using Dairy's software, CDI chose to

16 use Dairy's system to schedule raw deliveries and post product

17 availability to CDI's customers.

18     33.  In or around February 2018, Dairy approached CDI and

19 marketed CDI its mobile application called Mobile Manifest that

20 would facilitate data entry into CDI's system.  CDI's existing

21 software provider was developing its own mobile application at

22 the time; however, CDI decided to move forward with Dairy's

23 Mobile Manifest application.  At that time, CDI planned to have

24 Mobile Manifest data integrated into its existing payroll

25 processing system.

26     34.  Due to the establishment of a new Federal Milk

27 Marketing Order in June 2018, it became important to CDI's

28 business to have a fully integrated system that would work across

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

29

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   all processes.  CDI believed that Dairy could deliver on such

2   promises and ultimately terminated its agreement with its

3   existing software provider based on such promises.

4        35.  During the software transition process to Dairy, CDI

5   provided Dairy with access to CDI's data -- the same or similar

6   data CDI later supplied to MMI -- that was directly derived from

7   the excel spreadsheets and reports obtained from its then-current

8   software system.  CDI provided its information to Dairy to ensure

9   that Dairy had all of the right information and formatting CDI

10  required to help facilitate the transition.  The reports

11  generated from Dairy's system that are claimed by Dairy in this

12  lawsuit to be trade secrets are the same in all material respects

13  as those reports that were generated from the system CDI used

14  prior to its transition to Dairy.

15       36.  CDI began using Dairy's software platform when the

16  transition went live on November 1, 2018.  Once CDI started using

17  Dairy's platform, however, CDI quickly learned that the system

18  was not fully integrated as Dairy had promised.

19       37.  CDI also experienced several other issues with Dairy's

20  platform that led CDI to search for a new software provider and,

21  ultimately, choosing MMI's superior product.  For example,

22  Dairy's software platform was not fully integrated, it was only

23  interfaced.  This means that once CDI's data was entered into the

24  system, it had to be pushed to other platforms.  Because the data

25  push was not simultaneous, CDI and its members did not have

26  accurate data in real time.  This caused CDI's members to become

27  upset and reduced their confidence in CDI to provide them with

28  accurate and correct data.  Because the dairy industry is

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

30

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    federally regulated with set prices for commodities, the amount

2    that CDI pays to its members is dependent on a number of factors,

3    including the butterfat, protein, and other solids that are found

4    in the milk, as determined by third party laboratories that test

5    the milk.

6        38.  CDI also had significant issues with a few of the

7    standard reports that were generated from Dairy's software

8    platform system in order to balance with its raw milk customers.

9    For instance, one of the standard reports generated from CDI's

10   data in Dairy's software platform calculated the solids-not-fat

11   ("SNF") content of the milk collected by CDI members.  The SNF

12   number consists solely of adding up the protein content with the

13   other solids content of the milk.  The report generated from

14   Dairy's platform, however, failed to properly report the SNF

15   content by fractions of a pound each time.  CDI customers,

16   therefore, were affected by such software miscalculations and

17   began to question the validity of the data CDI provided to them.

18       39.  CDI asked Dairy to fix this miscalculation, but it took

19   Dairy several months to do so.  In the meantime, CDI was forced

20   to create a manual workaround to adjust the inaccuracies before

21   sending any reports to its customers.

22       40.  CDI also observed several flaws in Dairy's platform,

23   including one where occasionally--and randomly--loads of milk

24   would be replicated 100+ times.  As a result, there would be 100+

25   times more milk stated in a report than was actually present in

26   the system.  CDI had to develop a manual process to adjust these

27   inaccuracies as well.  As of December 2021, Dairy still had not

28   fixed that bug.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

31

1    41.   Because of the flaws in Dairy's platform, CDI

2   encountered large issues regarding its supply chain and was

3   forced to dump and/or discount large volumes of milk.  In 2021

4   alone, CDI lost more than eight million dollars in dumping or

5   discounting loads of milk.  CDI had several members complain that

6   they were missing milk and thus not getting paid for that milk

7   because these loads were not visible to them in the Dairy online

8   portal.  When CDI raised this issue with Dairy, CDI was informed

9   that it would require substantial programming and financial

10  investment by CDI to fix.

11    42.   Due to these issues and others, in March and April 2021

12  CDI began looking for other software providers that could offer

13  an integrated system and other capabilities.

14    43.   When CDI was looking into various new software

15  providers, MMI gave a demonstration to CDI in March or April of

16  2021 showing the processes and capabilities of MMI's software

17  platform.  CDI found MMI's software very attractive in three

18  important ways.

19        a. MMI's software enables CDI to have visibility of all of

20           its loads and trucks in real time using GPS and

21           Geofencing technology.  It further allows anyone with

22           internet access to pull up a map, see whether the

23           trucks are going in the right direction and to the

24           proper CDI or customer plant for processing.  This is

25           an important feature so that CDI can cut down on

26           inefficiencies and waste in its existing supply chain.

27           In CDI's opinion, Dairy's software platform does not

28           provide this real-time data.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

32

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

   b. MMI's software is a fully integrated system that allows anyone with access to see the same data that CDI sees in real-time.

   c. MMI's software has better electronic data capture capabilities, including the ability to attach images of paper tickets to each record in the system.

44.   CDI decided to use MMI's software platform due to its superior capabilities.

45.   Before entering into a contract with MMI for its services, CDI had already seen MMI's fully-developed software and its capabilities, and was confident in MMI's ability to satisfy CDI's software needs and provide far more benefits and capabilities than the software DDC provided to CDI.  If CDI had believed that MMI's software was still in development and needed further information from CDI to complete such development, then CDI would not have entered into its agreement with MMI.

46.   Because CDI was satisfied that MMI's software would increase its efficiency, it entered into a software and services agreement with MMI on September 17, 2021.  On that same day, CDI provided notice of its intent to terminate and discontinue its use of Dairy's software platform to Dairy.

47.   As is customary with a change in software platform vendors, CDI planned for the transition to take place over a period of months and be completed by February 1, 2022.

//

//

//

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

33

D.   **After Learning that CDI Was Transitioning to MMI's Platform, Dairy Attempted to Halt that Transition by Asserting Objectively Baseless Trade Secret Misappropriation Claims Against MMI**

48.   On September 17, 2021, Dairy learned from CDI that it planned to terminate its agreement with Dairy and transition to MMI's software platform.  Upon information and belief, Dairy also learned that CDI had entered into a software and services agreement with MMI.

49.   Having failed to eliminate MMI's competitive threat by acquisition, Dairy attempted to do so through the courts by initiating a frivolous lawsuit against MMI in the Central District of California on November 29, 2021.  *Dairy, LLC v. Milk Moovement, Inc., aka Milk Moovement, LLC*, Case No. 2:21-cv- 09279 (C.D. Cal.).  Dairy did not file for an emergency TRO in that court.  Instead, Dairy dismissed that action days later and then waited weeks to refile the same complaint in this Court on December 2, 2021.

50.   Despite knowing for months that CDI intended to transition to MMI's platform by February 1, 2022, Dairy nonetheless waited to file a lawsuit until November 29, 2021, and, for no apparent reason and in violation of the Local Rules waited until Friday, December 10, 2021, to file its TRO application, providing the TRO papers via email to MMI's COO on Friday, December 10, 2021, at 3:51 p.m. (7:51 p.m. for MMI).  Dairy's eleventh-hour rush to the courthouse and vexatious litigation tactics were designed to disrupt CDI's transition to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

34

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  MMI's software platform, sow doubt into the viability of the

2  company's business, and inject chaos into the industry.

3       51.  Dairy's original complaint in this Court alleged two

4  mirror image counts of trade secret misappropriation against

5  MMI — one under the Defend the Trade Secret Act ("DTSA") and the

6  other under California Uniform Trade Secret Act ("CUTSA") — based

7  on the same factual allegations: that MMI misappropriated Dairy's

8  trade secrets by requesting and receiving from CDI certain copies

9  of spreadsheet reports of CDI's own data, and Dairy's sole basis

10 for asserting those claims was a September 27, 2021, email

11 exchange between CDI and Dairy, where CDI sent MMI certain

12 spreadsheet reports of CDI's own data that it had pulled from

13 Dairy's software platform.  Based on this information, Dairy took

14 the unprecedented and baseless position that the reports

15 constituted its trade secrets and accused MMI of using the

16 reports to take away Dairy's customer, notwithstanding the fact

17 that MMI received the spreadsheets beginning ten days after CDI

18 terminated its agreement and signed with Dairy, and that a former

19 Dairy employee had previously sent MMI similar spreadsheet

20 reports pulled from Dairy's software platform.

21      52.  None of the information contained in the reports that

22 CDI provided to MMI is a Dairy trade secret.  Rather, the reports

23 that Dairy identified as its alleged trade secrets are commonly

24 generated in the dairy industry.  MMI generated comparable

25 reports from its systems well before receiving any reports from

26 CDI.  The reports are of the type regularly provided to customers

27 without confidentiality restrictions.  For example, the Loads by

28 Plant Report is a commonly generated report that MMI designed and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

35

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   implemented before it started working with CDI.  Similarly, MMI

2   developed the Pickups for Date Range Report process and reports

3   prior to receiving reports from CDI.  The reports are simply an

4   exportable version of the pickups table in MMI's application and

5   have been part of its system since before it started working with

6   CDI.

7       53.  All of the information in those reports/excel

8   spreadsheets is CDI data that CDI inputted, with the one

9   exception of load tracker numbers, which is a mere identifier

10  that CDI does not and has never used.  The types of data

11  contained in the reports are types of data that are necessary to

12  the operation of CDI's business.  By way of example, the

13  "Intransit Pounds" report contains information related to milk

14  that was picked up on one day, but not delivered to a customer

15  until the next day.  CDI needs that information to operate its

16  business because CDI pays its members based on the date the milk

17  was picked up, but federal reporting requires CDI to only report

18  milk based on the date of delivery.  This data is particularly

19  relevant for month-end accounting when milk was picked up in one

20  month, but not delivered until the next month.  Such information

21  is a necessary part of operating CDI's business and it is not in

22  any way proprietary to Dairy.

23      54.  The reports do not show screen shots of Dairy's

24  software platform.  Nor do the reports reveal details about the

25  underlying database in Dairy's software platform, they do not

26  show any source code associated with Dairy's software platform,

27  and they do not reveal the underlying formulas or math that is

28  used to perform calculations in Dairy's software platform.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

36

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    55.  Dairy also failed to undertake any reasonable secrecy

2   measures to restrict access to the reports themselves.  For

3   example, when the excel spreadsheet reports are pulled from

4   Dairy's software platform, no confidentiality legends are affixed

5   to them.  As yet another example, Dairy knowingly permits reports

6   pulled from its software platform to be freely shared amongst a

7   customer's members.

8    56.  It is well-known in the industry that the reports that

9   Dairy alleges to be its trade secrets are standard, commonly used

10   and not proprietary.  Most dairy companies use reports and

11   spreadsheets very similar to those reports generated using

12   Dairy's software platform.  Dairy's own employees have shared

13   reports pulled from Dairy's software platform with Dairy's

14   competitors.  As just one example, on July 12, 2021, Dairy

15   employee Aaron Keener shared a report with MMI that was pulled

16   from Dairy's software platform used by CDI.  Mr. Keener also

17   admitted that at least "some of the reports are standard to the

18   industry," without further identification.

19    57.  The reports that Dairy identifies as its trade secrets

20   are not meaningfully different from those that CDI pulled from

21   its former software system and sent to Dairy when it transitioned

22   to Dairy's software platform in November 2018.

23        a. **After Failing to Obtain a TRO, Dairy Attempted to**

24           **Tamper with a CDI Witness By Threatening to Terminate**

25           **CDI's Access to Dairy's Platform Early**

26    58.  On December 15, 2021, the Court denied Dairy's motion

27   for TRO, stating that Dairy had not demonstrated that it had

28   taken "reasonable measures" to keep the allegedly trade secret

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

37

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1 reports a secret.  The Court further found that Dairy provided

2 "no facts detailing how, if at all, plaintiff instructed CDI to

3 keep this information confidential or that the reports were at

4 the least labeled confidential."  This Court also ruled that

5 Dairy had failed to show "specific facts demonstrating that

6 immediate and irreparable injury will result before the court

7 could hear a motion for preliminary injunction."

8      59.  Even after this Court found that Dairy was not likely

9 to prove that the spreadsheet reports qualify as protectable

10 trade secrets, Dairy doubled down on its trade secret claims and

11 aggressively pursued a preliminary injunction against MMI.

12 Hoping to discount the testimonial evidence cited by MMI to

13 defeat a temporary restraining order, Dairy attempted to coerce

14 Dairy's Chief Financial Officer, Mr. Phil Girard, into recanting

15 and/or narrowing the scope of his December 14, 2021 declaration

16 in support of MMI's Opposition to the Temporary Restraining

17 Order, in which he stated, among other things, that "[n]one of

18 the information contained in the reports is a trade secret."  As

19 one example, Dairy sent CDI a letter on December 31, 2021,

20 threatening to terminate CDI's access to Dairy's software

21 immediately, which Dairy knew would cause serious harm to CDI and

22 its members, unless Mr. Girard put in writing that his December

23 14, 2021, declaration concerned only five of the reports that CDI

24 had sent to Dairy.  Although Mr. Girard believed that the

25 statements in his December 31, 2021, declaration were clear, he

26 nevertheless agreed to confirm in writing that his December 14,

27 2021, declaration concerned only the five reports listed by name

28 in paragraph 23 of his declaration so that Dairy would continue

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

38

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   providing CDI with access to the Dairy software until the
2   originally established date for termination.

3       60.   After securing this written statement from Mr. Girard,
4   Dairy moved for a preliminary injunction based on a new theory of
5   trade secret misappropriation, one that now focused on the
6   *Deliveries by Plant and FO* report rather than the five reports
7   Mr. Girard had addressed in his December 14, 2021, declaration.

8       61.   Despite Dairy's witness tampering and coercion,
9   Mr. Girard nevertheless submitted a sworn declaration and several
10  supporting exhibits to this Court on February 8, 2022,
11  demonstrating that the *Deliveries by Plant and FO* report is not a
12  trade secret, that it does not reveal pickup level pooling or any
13  other alleged trade secrets, and that it is not used by CDI to
14  make pickup level pooling decisions.

15          **b. After Failing to Obtain a Preliminary Injunction, Dairy**
16             **Continued to Assert Objectively Baseless Trade Secret**
17             **Misappropriation Claims Against MMI and Engaged in**
18             **Vexatious Litigation Tactics**

19      62.   After the Court denied Dairy's TRO motion, MMI
20  repeatedly asked Dairy whether it would be filing an amended
21  complaint due to the deficiencies in the complaint, particularly
22  the failure to identify any protectable trade secrets and the
23  lack of sufficient particularity.   Dairy declined to even try to
24  amend.

25      63.   On January 18, 2022, MMI moved to dismiss Dairy's
26  original complaint in this action.   Rather than defend the
27  woefully deficient allegations in its last complaint, Dairy
28  responded to MMI's Motion to Dismiss on the last possible day by

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

39

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    filing the First Amended Complaint ("FAC").

2        64.  Unlike the prior complaint, the FAC does not include a

3    definition of "Trade Secrets."  Rather, the FAC includes

4    historical information about Dairy, public information about the

5    Federal Milk Marketing Order ("FMMO") regulations, and a

6    discussion about pooling of fluid milk sales to harmonize milk

7    pricing.  At best, the FAC describes the general subject matter

8    of the alleged trade secret as "Dairy's software includes and

9    implements a methodology for handling FMMO pooling that is unique

10   in the industry and is Dairy's trade secret."

11       65.  The FAC also describes the alleged trade secret

12   information as "certain confidential, proprietary, and trade

13   secret information, including, but not limited to, the elements

14   of its producer payroll application that enable Dairy's clients

15   to make decisions about what milk to pool, accurately track their

16   pooling designations, and generate accurate reports and invoices

17   to comply with FMMOs."  Although the FAC adds several non-

18   exhaustive allegations concerning the "elements" of Dairy's

19   producer payroll application, it never describes those elements

20   with any specificity, choosing instead to simply replace one

21   vague term with another by referring to them interchangeably as

22   its "pooling methodology" and "pooling functionality."

23       66.  Muddying the waters even further, the FAC also alleges

24   that MMI requested and CDI provided to MMI "confidential, non-

25   trade secret, information about the structure, functionality, and

26   operation of Dairy's software" so that MMI could "create its own

27   fully functioning software application for the U.S. market."

28   Dairy provides no guidance for discerning which of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1                           40

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    information at issue in this case is trade secret and which is

2    "non-trade secret."

3        67.   As a further example of Dairy's ever-changing claims of

4    trade secret misappropriation, Dairy sought to shield from public

5    view the term "pickup level pooling" in its opening brief in

6    support of its motion for preliminary injunction, suggesting that

7    the concept of pickup level pooling was somehow Dairy's

8    confidential or trade secret information.  But after MMI

9    identified a Code of Federal Regulation section and other third-

10   party sources using this terminology publicly, Dairy filed its

11   reply brief without seeking a sealing order for that term.

12       68.   In addition to failing to describe any purported trade

13   secret, Dairy's trade secret claims were unsupported by any facts

14   showing that MMI actually "used" any of the information that it

15   received from CDI, let alone used the alleged trade secret

16   information.  Rather, Dairy admitted that it has alleged no such

17   facts, stating that "[a] reasonable opportunity for further

18   investigation or discovery *will likely show* that Milk Movement

19   then incorporated elements of Dairy's producer payroll

20   application, including its proprietary pooling functionality and

21   methods, into Dairy's software."  Dairy also inexplicably added

22   Milk Moovement LLC as a defendant to this suit, even though the

23   FAC includes no allegations specific to this entity.

24       69.   With the lack of any protectable trade secret under

25   state or federal law, the lack of reasonable measures to maintain

26   the secrecy of any alleged trade secret, and the lack of any

27   evidence of use by MMI of any alleged trade secret, Dairy had no

28   reasonable or objective basis for asserting a claim of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

41

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

misappropriation of trade secrets.  On information and belief,
when Dairy filed the FAC, Dairy knew or should have known that
the alleged trade secret information is not protectable under
existing law.  Neither the reports generated using Dairy's
software nor the pick-up level pooling functionality purportedly
revealed by some of those reports has ever been the subject of
reasonable secrecy measures.  Dairy did not plead any facts in
the FAC to address these shortcomings after the Court found that
its previous complaint provides "no facts detailing how, if at
all, plaintiff instructed [its clients] to keep this information
confidential, or that the reports were at least labeled
confidential."  The FAC's allegations of trade secret
misappropriation are equally deficient, as reflected in the
Court's denial of Dairy's Motion for Preliminary Injunction.  The
Court found that "[Dairy] has not shown a likelihood that [it]
can establish it took reasonable measures under the circumstances
to maintain secrecy over the information in reports plaintiff
alleges are trade secrets."

70.  Dairy also knew or should have known that neither the
concept of "pickup level pooling" nor its "pickup level pooling
methodology" can qualify as a trade secret.  Milk handlers have
been pooling milk since long before supply chain software tools
were used in the industry.  Before computers, handlers would make
pooling decisions manually using pen and paper.

71.  Market-wide pooling is how dairy farmers share in the
benefits arising from classified pricing of milk.  Pooling allows
farmers to receive the weighted average price of the milk, by
class.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

42

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1      72.   It is commonly known in the industry that batches of

2   milk are pooled or depooled by plant, load, farmer, and/or

3   pickup.

4      73.   The term "pickup level pooling" refers to pooling of

5   milk based on each time milk is picked up from a farm.  The term

6   is commonly used throughout the industry, including in the U.S.

7   regulations that define Producer Milk.  The definition at 7

8   C.F.R. section 1030.13 states: "The handler must designate, by

9   producer pick-up, which milk is to be removed from the pool.  If

10  the handler fails to provide this information, the market

11  administrator will make the determination."

12     74.   Standard software in this industry is used to track the

13  amount and quality of milk that is picked up from a farm, how

14  much goes to a specific plant for processing, and how much to pay

15  the farmer for the milk that was picked up from that farm.  It is

16  further standard for software in this industry to provide a

17  platform that summarizes, filters, and presents all of the pickup

18  level data on a single screen (with multiple pages), and permits

19  sorting by a variety of datapoints, such as producer, date range,

20  plant, geographical group, or marketing order.  These are common

21  data points that any dairy co-op in the United States would need

22  to track and report in order to comply with the FMMO.  Dairy

23  producers outside the United States need the same information,

24  with the exception of the FMMO pricing.

25     75.   Dairy supply chain software used in the U.S. market

26  does not calculate pricing.  Rather, the FMMO calculates and

27  publishes pricing numbers monthly.  The numbers that are

28  published by the FMMO are then used to calculate payments to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1                              43

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   producers via a simple and straightforward process.

2        76.   Because the minimum milk prices are posted publicly by

3   the FMMO, complying with the FMMO is not particularly

4   complicated.

5        77.   The entire state of California, where CDI operates, is

6   deemed to be a single marketing area by the FMMO.  As a result,

7   California prices and quality are uniform throughout the state,

8   adding to the ease of implementation for CDI.

9        78.   During CDI's transition to MMI's system, MMI was able

10  to easily comply with the FMMO because the FMMA provided the

11  following minimum required datapoints that must be in the daily

12  weights file: (1) month/year; (2) producer number; (3) tank

13  number; (4) producer name; (5) manifest number; (6) pick up date;

14  (7) delivery date; (8) pool order number (to indicate whether the

15  producer is being pooled or not); (9) pounds; (10) fat test; (11)

16  fat pounds; (12) protein test; (13) protein pounds; (14) other

17  solids test; (15) other solids pounds; and (16) plant delivered

18  to (either plant number or name). The FMMA also sent a list of

19  data that was required to be included in the payroll file,

20  including: (1) producer number; (2) producer name; (3) address;

21  (4) pounds; (5) butterfat; (6) protein; (7) other solids; (8)

22  gross value (total gross to include premiums); (9) total

23  premiums; (10) total deduct; (11) deduct by type (for example,

24  haul, promo, coop dues, quota, assign, etc.); (12) net value; and

25  (13) advance pay.  MMI did not gain a head start by receiving

26  reports from CDI because the data required to comply with the

27  FMMO is not a secret; the FMMA gives it to you.

28        79.   Dairy likewise knew or should have known that the FAC's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

44

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    allegations of misappropriation by use are false, including its

2    "information and belief" allegations that MMI incorporated into

3    its software Dairy's "pick-up level functionality" or "pick-up

4    level pooling methodology" because MMI's software platform

5    neither implements any pick-up level pooling functionality of the

6    type alleged by Dairy to have been misappropriated, or uses any

7    pick-up level pooling methodologies to make pick-up level pooling

8    decisions for CDI or any other customer.  The Court found these

9    facts conclusive when it held that "plaintiff has not shown a

10   likelihood of establishing that the information was

11   misappropriated" since "the software defendant has created for

12   CDI does not make pickup-level pooling decisions for CDI."  The

13   fact that CDI did not use the pick-up level pooling methodology

14   that Milk Moovement is accused of receiving from CDI and

15   misappropriating makes the allegations even more extraordinary.

16       80.  The FAC's allegations of trade secret misappropriation

17   are based on nothing more than Dairy's unfounded suspicions of

18   wrongdoing by MMI and its bad faith intent to reduce competition.

19       81.  Any pre-suit investigation conducted by Dairy into the

20   viability of its trade secret claims was woefully deficient.

21   Even a cursory investigation would have revealed that CDI never

22   even used Dairy's software platform to make "pick-up level

23   pooling" decisions.  Rather, CDI made its own pooling decisions

24   using its own spreadsheet with CDI's proprietary algorithms,

25   wholly separate from Dairy's software.

26   //

27   //

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

45

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

**E.   Dairy Engaged in False Advertising and Deceptive Trade Practices**

82.   To further foreclose competition, Dairy has also engaged in a systematic campaign to falsely advertise its market share position and influence consumers' perceptions of customer satisfaction and product quality in a concerted effort to appeal to the relevant consuming public, including MMI's current and prospective customers, and persuade them to license Dairy's software platform over MMI's software platform.

83.   On the homepage of Dairy's website (https://www.dairy.com), for example, Dairy states that its platform is "Trusted by Over 80% of the Dairy Foods' Top 100," which indicates to consumers that 80% of the Dairy Foods' Top 100 use Dairy's software platform.  This statement has appeared on Dairy's website since at least April 4, 2021.



84.   On information and belief, the actual percentage of Top 100 dairy companies that currently license and/or use Dairy's software platform is well below 80% because CDI, which ranks as

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

46

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  No. 10 on Dairy Foods' Top 100 List, has since terminated its

2  licensing agreement with Dairy and begun using MMI's software

3  platform.

4      85.   On information and belief, Dairy has disseminated

5  similar statements to MMI's current and prospective customers.

6  For example, Dairy has publicly disseminated advertisements

7  stating that "80% of Dairy Foods' Top 100 dairy companies are

8  already working with Dairy.com" and that "80% of the Dairy Foods'

9  Top 100 is served by Dairy.com."

10      86.   By using an inflated market share position amongst the

11  Top 100 Dairy companies as a focal point of its advertising,

12  Dairy's false and misleading statements have caused and will

13  continue to cause consumers to perceive Dairy's software platform

14  as being superior in terms of customer satisfaction and product

15  quality relative to the competition, including MMI's software

16  platform.

17      87.   As another example, Dairy states on the homepage of its

18  website that Dairy.com's software platform "touches 100 billion

19  pounds of milk each year," which indicates to consumers that 100

20  billion pounds of milk goes through Dairy's software platform

21  each year.  Variations of this statements have appeared on

22  Dairy's website since at least April 4, 2021.

23  //

24

25  //

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

47

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

88.  On information and belief, the actual pounds of milk that currently goes through Dairy's software platform is well below 100 billion because CDI, which ranks as No. 10 on Dairy Foods' Top 100 List, has since terminated its licensing agreement with Dairy and begun using MMI's software platform, and because Dairy is double-counting the pounds of milk.

89.  On information and belief, Dairy has disseminated similar statements to MMI's current and prospective customers. For example, Dairy has publicly stated that "over 100 billion pounds of milk move through its systems."

90.  By using an inflated market share position as a focal point of its advertising, Dairy's false and misleading statements have caused and will continue to cause consumers to perceive Dairy's software platform as being superior in terms of customer satisfaction and product quality relative to the competition, including MMI's software platform.

91.  Upon information and belief, Dairy knew or should have known that the advertised percentage of companies from the Dairy Foods' Top 100 that use its software platform as well as the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

48

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  number of pounds touched by its software platform are inaccurate.

2  Nevertheless, Dairy has continued to advertise an inflated market

3  share in order to influence MMI's current and prospective

4  customers' purchasing decisions.

5      92.  Additionally, upon information and belief, Dairy's

6  false and misleading advertisements, including statements that

7  Dairy's software platform is "trusted by over 80% of the Dairy

8  Foods' Top 100" and that it "touches 100 billion pounds of milk

9  each year," actually deceived, or have a tendency to deceive, a

10  substantial segment of MMI's existing and prospective customers,

11  including, but not limited to, companies listed in the Dairy

12  Foods' Top 100 List.

13      93.  Upon information and belief, Dairy has disseminated

14  other statements that are false, misleading, and/or failures to

15  disclose in connection with Dairy's software platform throughout

16  MMI's current and prospective customer base, including, but not

17  limited to, statements similar to those alleged herein.

18  Therefore, Dairy's false and misleading statements discussed

19  herein are exemplary only, and other instances of Dairy's

20  misconduct will be proven at trial.

21      94.  Upon information and belief, Dairy knew or should have

22  known that its false advertisements and statements to MMI's

23  current and prospective customers contain statements that are

24  literally false, misleading, and/or failures to disclose.

25      95.  Moreover, upon information and belief, the above

26  advertisements and statements by Dairy are literally false and/or

27  actually deceive, or have a tendency to deceive, a substantial

28  segment of MMI's existing and prospective customers.  This

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

49

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1   deception is material in that it is likely to influence the

2   purchasing decision of MMI's current or prospective customers.

3       96.   The natural, probable, and foreseeable result of

4   Dairy's wrongful conduct has been to cause confusion, deception,

5   and mistake in the relevant marketplace as a whole, to deprive

6   MMI of business and goodwill, and to damage consumer perception

7   of MMI's software platform.

8       97.   Dairy's wrongful conduct has resulted in increased

9   sales of its software platform.   On information and belief,

10  Dairy's false and misleading advertisements also hindered sales

11  of MMI's software platform and damaged MMI's reputation and

12  goodwill in the marketplace.   MMI has sustained and will continue

13  to sustain damages as a result of Dairy's false advertising and

14  deceptive trade practices.

15              **FIRST COUNTERCLAIM**

16      **Declaratory Judgment of No Protectable Trade Secret**

17              **Under 18 U.S.C. § 1836, *et seq.***

18      98.   Paragraphs 1 through 97 are incorporated by reference

19  as if fully stated herein.

20      99.   Dairy has alleged that certain information owned by

21  Dairy qualifies as a protectable trade secret information under

22  the Defend the Trade Secret Act, 18 U.S.C. § 1836, *et seq.*,

23  namely the spreadsheet reports that MMI received from CDI and the

24  so-called pick-up level pooling methodology implemented by

25  Dairy's software platform.

26      100. For at least the reasons stated above, none of the

27  information Dairy identifies as a trade secret qualifies as a

28  protectable trade secret information under the Defend the Trade

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1                    50                    DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1 | Secret Act, 18 U.S.C. § 1836, *et seq.*

2 |    101. Thus, an immediate, real, and justiciable controversy

3 | has arisen between MMI and Dairy concerning Dairy's allegations

4 | of trade secret misappropriation in violation of the DTSA.

5 |    102. MMI is entitled to declaratory judgment from this Court

6 | that the information identified by MMI as a trade secret is not a

7 | protectable trade secret under the Defend the Trade Secret Act,

8 | 18 U.S.C. § 1836, *et seq.*

9 | **SECOND COUNTERCLAIM**

10 | **Declaratory Judgment of No Misappropriation**

11 | **Under 18 U.S.C. § 1836, *et seq.***

12 |    103. Paragraphs 1 through 102 are incorporated by reference

13 | as if fully stated herein.

14 |    104. In its FAC, Dairy alleges that MMI has misappropriated

15 | Dairy's trade secrets and confidential information in violation

16 | of the Defend the Trade Secret Act, 18 U.S.C. § 1836, *et seq.*

17 |    105. MMI has not received any Dairy trade secrets or

18 | confidential Dairy information from CDI.

19 |    106. MMI has never possessed, acquired, or used Dairy trade

20 | secrets or confidential Dairy information.

21 |    107. Thus, an immediate, real, and justiciable controversy

22 | has arisen between MMI and Dairy concerning Dairy's allegations

23 | of trade secret misappropriation in violation of the Defend the

24 | Trade Secret Act, 18 U.S.C. § 1836, *et seq.*

25 |    108. MMI is entitled to declaratory judgment from this Court

26 | that MMI has not misappropriated and is not now misappropriating

27 | Dairy's trade secrets.

28 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

51

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

**THIRD COUNTERCLAIM**

**Declaratory Judgment of No Protectable Trade Secret**

**Under Cal. Civ. Code § 3426, *et seq.***

109. Paragraphs 1 through 108 are incorporated by reference as if fully stated herein.

110. Dairy has alleged that certain information owned by Dairy qualifies as a protectable trade secret information under the California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.*, including the spreadsheet reports that MMI received from CDI and the so-called pick-up level pooling methodology implemented by Dairy's software platform.

111. For at least the reasons stated above, none of the information Dairy identifies as an alleged trade secret qualifies as a protectable trade secret information under the California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.*

112. Thus, an immediate, real, and justiciable controversy has arisen between MMI and Dairy concerning Dairy's allegations of trade secret misappropriation in violation of the California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.*

113. MMI is entitled to declaratory judgment from this Court that the information identified by MMI as a trade secret is not a protectable trade secret under the California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.*

**FOURTH COUNTERCLAIM**

**Declaratory Judgment of No Misappropriation**

**Under Cal. Civ. Code § 3426, *et seq.***

114. Paragraphs 1 through 113 are incorporated by reference as if fully stated herein.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

52

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    115. In its FAC, Dairy alleges that MMI has misappropriated

2    Dairy's trade secrets and confidential information in violation

3    of the California Uniform Trade Secret Act, Cal. Civ. Code

4    § 3426, *et seq*.

5    116. MMI has not received any Dairy trade secrets or

6    confidential Dairy information from CDI.

7    117. MMI has never possessed, acquired, or used Dairy trade

8    secrets or confidential Dairy information.

9    118. Thus, an immediate, real, and justiciable controversy

10   has arisen between MMI and Dairy concerning Dairy's allegations

11   of trade secret misappropriation in violation of the California

12   Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq*.

13   119. MMI is entitled to declaratory judgment from this Court

14   that MMI has not misappropriated and is not now misappropriating

15   Dairy's trade secrets.

16                          **<u>FIFTH COUNTERCLAIM</u>**

17          **Sham Litigation in Violation of 15 U.S.C. § 2**

18   120. Paragraphs 1 through 119 are incorporated by reference

19   as if fully stated herein.

20   121. For purposes of this litigation, the market for the

21   sale of dairy supply chain software used by dairy producers,

22   processors, and haulers in the United States (the "Relevant

23   Market") constitutes a relevant market.

24   122. Dairy has monopoly power in the Relevant Market.  On

25   information and belief, Dairy controls at least 75% of the

26   Relevant Market.  Dairy represents on its web site that its

27   software is used by "Over 80% of the Dairy Foods' Top 100," which

28   comprises the largest customers in the Relevant Market.  It

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1                    53

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1 | further represents on its web site that "Dairy.com serves over
2 | 15,000 farms across the US."

3 | 123. Dairy has engaged in exclusionary and predatory
4 | conduct, including without limitation the filing and maintenance
5 | of sham litigation.  Less than three months after CDI signed an
6 | agreement with MMI and notified Dairy that it would be
7 | terminating its license with Dairy, Dairy willfully and
8 | intentionally asserted meritless claims against MMI, alleging in
9 | bad faith, with no objective or subjective basis, that MMI
10 | misappropriated its trade secrets.  Dairy's tortious interference
11 | claim is likewise objectively baseless, and brought with the
12 | intention to use the litigation process itself to harm MMI,
13 | specifically, and to limit competition generally.

14 | 124. Dairy's wrongful conduct has allowed it to maintain its
15 | monopoly power, improperly impeding and delaying the entry of
16 | MMI's competing system.

17 | 125. Dairy has caused and will continue to cause substantial
18 | loss and injury to MMI due to Dairy's violation of the antitrust
19 | laws.  MMI has incurred substantial litigation costs and
20 | attorneys' fees based on Dairy's objectively baseless claims that
21 | limited its ability to compete effectively.  Dairy's conduct is
22 | the actual and proximate cause of the threatened loss and injury
23 | to MMI.

24 | 126. For the reasons set forth above, no reasonable litigant
25 | could realistically expect to succeed on the merits of Dairy's
26 | claims against MMI, and thus Dairy's litigation and pursuit of
27 | equitable relief were objectively baseless.

28 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

54

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    127. On information and belief, Dairy instituted its

2    meritless lawsuit against MMI as part of its overall

3    anticompetitive scheme to interfere directly with MMI's ability

4    to compete in the market, to intimidate market entrants, to raise

5    its rival's costs, to harm MMI's reputation and interfere with

6    its business relations, and to deprive MMI of resources that

7    would have otherwise been spent on offering its software platform

8    to clients at favorable prices.

9    128. As a result of this sham litigation, MMI was forced to

10   incur substantial litigation fees and costs, rather than use

11   those resources to compete against Dairy.  Competition in the

12   market has thus been harmed.

13   129. Dairy's vexatious litigation strategy was successful in

14   maintaining its competitive advantage.  MMI has been forced to

15   spend money and time defending against Dairy's frivolous trade

16   secret and tortious interference claims.  Moreover, the lawsuit

17   has been used by Dairy to sow doubt and confusion about the

18   viability of a competing supply chain software platform.  On

19   information and belief, Dairy used the existence of the lawsuit

20   in order to convince producers to stop doing business with MMI

21   (or not do business with MMI) and to convince potential and

22   actual investors to not invest in MMI, or to invest lesser

23   amounts (or on less favorable terms) than they otherwise would

24   have.

25   130. The lawsuit created confusion in the market as Dairy

26   used the lawsuit as a means to convince consumers that it would

27   win and would secure an injunction to prohibit MMI from offering

28   a competing supply chain software platform.  MMI devoted

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

55

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    significant resources to the defense against these baseless

2    claims, including substantial legal costs and fees.  Dairy's sham

3    litigation has made it more burdensome for MMI to provide

4    software services for its existing customers.  On information and

5    belief, MMI has also lost potential customers due to Dairy's

6    objectively baseless lawsuit.

7        131. On information and belief, Dairy initiated this action

8    against MMI knowing that it could not prove the existence of a

9    protectable trade secret or that MMI used any protectable trade

10   secret.  On information and belief, rather than protect its

11   alleged trade secrets or non-trade secret confidential

12   information, Dairy initiated this lawsuit to prevent CDI from

13   transitioning to MMI, prevent MMI from gaining greater traction

14   with customers in the United States, create doubt in the

15   marketplace regarding MMI's Supply Chain Software, disrupt MMI's

16   customer and investor relationships, and harm MMI's ability to

17   compete with Dairy's Supply Chain Software by forcing MMI to

18   divert resources from marketing its Supply Chain Software to

19   defend against Dairy's claims and to incur substantial legal fees

20   associated with their defenses, thereby increasing of the costs

21   MMI's products and devaluing MMI's company.  On information and

22   belief, Dairy initiated this litigation to harm MMI's ability to

23   compete with Dairy's business by creating confusion and doubt

24   among MMI's potential supply chain software customers and by

25   delaying MMI's ability to grow its business in the U.S.  Dairy's

26   reasons for initiating this lawsuit are evidenced by its

27   vexatious litigation tactics and continued prosecution of

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

56

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1  meritless trade secret misappropriation and tortious interference

2  claims.

3      132. On information and belief, this conduct harmed both the

4  competitive process and consumers by allowing Dairy to charge

5  supracompetitive prices and/or to offer an inferior supply chain

6  software that did not meet the needs of consumers, and by

7  delaying the growth of a new company offering a superior software

8  product that competes with Dairy's platform.

9      133. Dairy's conduct has occurred in interstate commerce,

10  and its threatened future conduct would occur in interstate

11  commerce.

12              **SIXTH COUNTERCLAIM**

13         **False Advertising, 15 U.S.C. § 1125(a), *et seq*.**

14      134. Paragraphs 1 through 133 are incorporated by reference

15  as if fully stated herein.

16      135. Dairy has made and distributed, in interstate commerce

17  and in this District, advertisements that contain false and

18  misleading statements of fact regarding its market share

19  position.  These advertisements contain statements that are

20  literally false, actual misstatements, and/or misleading

21  statements and failures to disclose information concerning its

22  market share position.  Dairy's false and misleading statements

23  include, among others, statements that Dairy's software platform

24  is "trusted by 80% of the Dairy Foods' Top 100" and "touches 100

25  billion pounds of milk per year."

26      136. Upon information and belief, these false statements

27  actually deceive, or have a tendency to deceive, a substantial

28  segment of MMI's current and prospective customers by, for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

57

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

example, leading such customers to perceive Dairy's software platform as being superior in terms of customer satisfaction and product quality relative to the competition, including MMI's software platform.  This deception is material in that it is likely to influence the purchasing decisions of MMI's current and prospective customers.

137. Dairy's false and misleading statements and omissions injure both consumers and MMI.

138. Dairy's false and misleading statements and omissions violate the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

139. Dairy has caused, and will continue to cause, immediate and irreparable injury to MMI for which there is no adequate remedy at law.  As such, MMI is entitled to an injunction under 15 U.S.C. § 1117 restraining Dairy, its agents, employees, representatives, and all persons acting in concert with Dairy from engaging in further acts of false advertising, and ordering removal of all Dairy's false advertisements.

140. Pursuant to 15 U.S.C. § 1117, MMI is entitled to recover from Dairy the damages sustained by MMI as a result of Dairy's acts in violation of Lanham Act § 43(a).  MMI is at present unable to ascertain the full extent of the monetary damages it has suffered by reason of Dairy's acts.

141. Pursuant to 15 U.S.C. § 1117, MMI is further entitled to recover from Dairy the gains, profits, and advantages that it has obtained as a result of its acts.  MMI is at present unable to ascertain the full extent of the gains, profits, and advantages Dairy has obtained by reason of its acts.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

58

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    142. Pursuant to 15 U.S.C. § 1117, MMI is further entitled

2    to recover from Dairy the costs of this action.  Moreover, upon

3    information and belief, Dairy's conduct was undertaken willfully

4    and with the intention of causing confusion, mistake, and

5    deception, making this an exceptional case entitling MMI to

6    recover additional damages and reasonable attorneys' fees.

7    **SEVENTH COUNTERCLAIM**

8    **False Advertising, Cal. Bus. & Prof. Code § 17500, *et seq*.**

9    143. Paragraphs 1 through 142 are incorporated by reference

10   as if fully stated herein.

11   144. Dairy knew, or in the exercise of reasonable care

12   should have known, that its publicly disseminated statements and

13   omissions relating to Dairy's market share position were false

14   and/or misleading.  Dairy's false and misleading statements

15   include, among others, statements that Dairy's software platform

16   is "trusted by 80% of the Dairy Foods' Top 100" and "touches 100

17   billion pounds of milk per year."

18   145. Upon information and belief, these false statements

19   actually deceive, or have a tendency to deceive, a substantial

20   segment of MMI's current and prospective customers by, for

21   example, leading such customers to perceive Dairy's software

22   platform as being superior in terms of customer satisfaction and

23   product quality relative to the competition, including MMI's

24   software platform.

25   146. By making such false and misleading statements, Dairy

26   has engaged in false advertising in violation of the statutory

27   laws of the state of California, Cal. Bus. & Prof. Code § 17500,

28   *et seq.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

59

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    147. By reason of Dairy's conduct, MMI has suffered injury

2  in fact and lost money or property.

3    148. Dairy has caused, and will continue to cause, immediate

4  and irreparable injury to MMI, including injury to its business,

5  reputation, and goodwill, for which there is no adequate remedy

6  at law.  MMI is further entitled to an injunction restraining

7  Dairy, its agents, employees, representatives, and all persons

8  acting in concert with Dairy from engaging in further such acts,

9  and forbidding Dairy from making false and misleading statements.

10    149. MMI is further entitled to a restitutionary recovery

11  from Dairy.

## EIGHTH COUNTERCLAIM

**Intentional Interference with Prospective Economic Advantage**

14    150. Paragraphs 1 through 149 are incorporated by reference

15  as if fully stated herein.

16    151. Prior to and during the events recounted above, MMI

17  maintained economic relationships with numerous current and

18  prospective investors, including the investment funds named

19  above, which had the probability of future economic benefit to

20  MMI based upon the likelihood of those parties' investment in

21  MMI.

22    152. Dairy was made aware of these relationships at least

23  through MMI's April 21, 2021, press release, which reported that

24  MMI had "closed on $3.2 million in additional funding led by

25  Dynamo Ventures, and backed by Bread & Butter Ventures,

26  Matchstick Ventures, and  Better Food Ventures," and that "SOSV

27  and Techstars also provided follow-on investments to the round,

28  and high-profile industry leader and member of Cargill's Board of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

60

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1    Directors, Richard Cargill, is another personal angel investor in

2    the company."

3        153. Based on this press release, Dairy knew that MMI had

4    completed its seed funding and would be seeking additional rounds

5    of funding by opting into Series A funding next.  Indeed, after

6    MMI turned down a meeting with Dairy's CEO, Scott Sexton, that

7    had been organized by Kyle Hufford, Vice President at Banneker

8    Partners, MMI received an email from Mr. Hufford on May 21, 2021,

9    stating: "Ok fair enough, congrats on the latest capital raise

10   and we'll check back down the road a bit."

11       154. After MMI rebuffed this invitation, Dairy intentionally

12   acted to disrupt and harm relationships between MMI and numerous

13   potential and actual investors through a variety of acts,

14   including, but not limited to, filing and vigorously pursuing its

15   objectively baseless trade secret misappropriation claims against

16   MMI.

17       155. These acts were independently violative of numerous

18   state and federal laws, including, but not limited to, the

19   Sherman Act, the Lanham Act, and California's Business and

20   Professions Code.

21       156. Dairy's behavior caused potential and actual investors

22   to not invest in MMI, or to invest lesser amounts or on less

23   favorable terms than they otherwise would have.

24       157. As a result of Dairy's disruption of MMI's relationship

25   with potential and actual investors, MMI has suffered and will

26   continue to suffer great harm.  MMI is therefore entitled to

27   compensatory damages in an amount to be determined at trial.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 43092452.1

61

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1

**NINTH COUNTERCLAIM**

2

**Unfair Competition, Cal. Bus. & Prof. Code. § 17200, *et seq.***

3    158. Paragraphs 1 through 157 are incorporated by reference

4 as if fully stated herein.

5    159. Dairy's sham litigation against MMI, tortious

6 interference with Milk Moovement, Inc.'s investor relationships,

7 false advertising of its market share, and its other unfair trade

8 practices described above constitutes an unfair, unlawful, and/or

9 deceptive trade practice.

10    160. Dairy's acts are in violation of California's Unfair

11 Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

12    161. As a consequence of the foregoing, MMI has suffered and

13 will continue to suffer irreparable harm and loss.

14

**TENTH COUNTERCLAIM**

15

**Unjust Enrichment**

16    162. Paragraphs 1 through 161 are incorporated by reference

17 as if fully stated herein.

18    163. As a result of the conduct alleged herein, Dairy has

19 been unjustly enriched to MMI's detriment.  MMI therefore seeks

20 an accounting and disgorgement of all ill-gotten gains and

21 profits resulting from Dairy's inequitable activities.

22

**DEMAND FOR JURY TRIAL**

23    164. Pursuant to Fed. R. Civ. P. 38(b), Defendant and

24 Counterclaim-Plaintiff MMI demands a trial by jury on all issues

25 triable by a jury in this action.

26

**PRAYER FOR RELIEF**

27    WHEREFORE, MMI prays that the Court enter judgment in its

28 favor and against Dairy as follows:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

1. A judgment and order adjudicating and declaring that Dairy's alleged trade secret information does not qualify as a protectable trade secret under either the Defend the Trade Secret Act or the California Uniform Trade Secret Act;

2. A judgment and order adjudicating and declaring that MMI did not misappropriate Dairy's alleged trade secret information in violation of either the Defend the Trade Secret Act or the California Uniform Trade Secret Act;

3. A judgment and order adjudicating and declaring that Dairy has engaged in anticompetitive behavior by initiating a sham limitation against MMI in violation of 15 U.S.C. § 2.

4. A judgment and order adjudicating and declaring that Dairy has made false, deceptive, and misleading statements of fact that misrepresent its market share, consumer satisfaction, and quality of its software product, in violation of 15 U.S.C. § 1125(a);

5. A judgment and order adjudicating and declaring that Dairy has engaged in false and misleading advertising under the laws of the State of California, Cal. Bus. & Prof. Code § 17500, *et seq.*;

6. A judgment and order requiring Dairy to correct any erroneous impression persons may have derived from concerning the nature, characteristics, or qualities of the Accused Products, including, without limitation, the placement of correct advertising and providing written notice to the public;

7. A judgment and order adjudicating and declaring that Dairy tortiously interfered with MMI's prospective business advantage;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1

63

DEFENDANTS' ANSWER TO FAC AND
MMI'S COUNTERCLAIMS
2:21-CV-02233-WBS-AC

8.    A judgment and order adjudicating and declaring that Dairy has engaged in unfair competition in violation of California's Unfair Competition Law;

9.    A judgment and order under 15 U.S.C. § 26 permanently enjoining and restraining Dairy, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from continuing the unlawful acts in violation of the Sherman Act, the Lanham Act, the California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200, *et seq*. and 17500, *et seq*.;

10.    Damages sustained by MMI, as provided by the federal and state antitrust and unfair competition laws, and a joint and several judgment in favor of MMI shall be entered against Dairy in an amount to be trebled in accordance with such laws;

11.    Pre-judgment and post judgment interest at the maximum legal rate;

12.    Dairy's costs, expenses, and reasonable attorneys' fees in bringing this action;

13.    An award of punitive damages; and

14.    Such other relief as this Court may deem just and proper.

Dated:    April 27, 2022          MORGAN, LEWIS & BOCKIUS LLP

By  /s/ Carla B. Oakley
    CARLA B. OAKLEY

    Attorneys for Defendants
    Milk Moovement, Inc. and
    Milk Moovement LLC, and
    Counterclaim-Plaintiff Milk
    Moovement, Inc.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 43092452.1                                    64                    DEFENDANTS' ANSWER TO FAC AND
                                                                          MMI'S COUNTERCLAIMS
                                                                          2:21-CV-02233-WBS-AC