1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                            ----oo0oo----

11

12   DAIRY, LLC,[1] a Delaware Limited          No. 2:21-cv-02233 WBS AC
     Liability Company,
13
              Plaintiff/
14            Counterdefendant,                  MEMORANDUM AND ORDER RE:
                                                 DAIRY'S MOTION TO STRIKE AND
15        v.                                     MOTION TO DISMISS SECOND
                                                 AMENDED COUNTERCLAIMS
16   MILK MOOVEMENT, INC., a foreign
     Corporation, and MILK MOOVEMENT
17   LLC, a Delaware Limited
     Liability Company,
18
              Defendants/
19            Counterclaimants.

20

21                            ----oo0oo----

22            Dairy, LLC ("Dairy") initiated this action against Milk

23   Moovement, Inc. and Milk Moovement, LLC alleging trade secret

24   misappropriation under federal and California law, and

25   intentional interference with contractual relations.  (First Am.

26   Compl. (Docket No. 48).)  Milk Moovement then alleged five

27   _____

28        [1]   Dairy has changed its name to Ever.Ag.  However, this
     order will continue to refer to Dairy for convenience.

                                    1

1   counterclaims: four claims for declaratory judgment under various

2   trade secret laws and one antitrust claim for sham litigation.

3   (Docket No. 111).  The court dismissed the sham litigation

4   counterclaim twice, but permitted the declaratory judgment

5   counterclaims.  (Docket Nos. 105, 134.)  Upon obtaining new

6   information during discovery, Milk Moovement requested leave to

7   amend its counterclaims and add six new antitrust related

8   counterclaims.  (Docket No. 204.)  The court granted Milk

9   Moovement's request.  (Docket No. 244.)

10          In its Second Amended Counterclaims, Milk Moovement

11   alleges new facts that Dairy engaged in various types of

12   anticompetitive conduct and asserts ten counterclaims, including

13   the four previously pled declaratory judgment claims: (1) no

14   protectable trade secret under the Defend Trade Secrets Act, 18

15   U.S.C. § 1836; (2) declaratory judgment of no misappropriation

16   under the Defend Trade Secrets Act, id.; (3) declaratory judgment

17   of no protectable trade secret under the California Uniform Trade

18   Secrets Act, California Civil Code § 3426 et seq.; (4)

19   declaratory judgment of no misappropriation under the California

20   Uniform Trade Secrets Act, id.; (5) conspiracy to monopolize

21   under § 2 of the Sherman Act, 15 U.S.C. § 2; (6) monopolization

22   and attempted monopolization under § 2 of the Sherman Act, id.;

23   (7) unlawful restraint of trade under § 1 of the Sherman Act, 15

24   U.S.C. § 1; (8) unlawful restraint of trade under California's

25   Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; (9)

26   unlawful mergers or acquisitions under § 7 of the Clayton Act, 15

27   U.S.C § 18; and (10) unfair competition under California's Unfair

28   Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

1   (Docket No. 249.)

2         Before the court are Dairy's motion to strike (Docket

3   No. 270) and motion to dismiss (Docket No. 266) the Second

4   Amended Counterclaims.

5   I.   <u>Factual Allegations</u>[2]

6         Milk is an important and heavily regulated commodity in

7   the United States.  (2d Am. Countercls. ¶ 96.)  American

8   consumers collectively spend more than $15 billion on milk each

9   year.  (<u>Id.</u> ¶ 80.)  Participants in the dairy industry manage a

10  large amount of data including milk prices, quantity, location,

11  transit updates, quality testing, and invoices. (<u>Id.</u> ¶ 96.)

12        Under federal law, the United States Department of

13  Agriculture ("USDA") issues Federal Milk Marketing Orders

14  ("FMMOs"), which then set milk prices across statutorily divided

15  geographic regions.  (<u>Id.</u> ¶ 103.)  Pursuant to the FMMOs, milk

16  can be "pooled" and therefore subject to regulated pricing.  (<u>Id.</u>

17  ¶ 104.)  All Class I milk (liquid beverage milk) must be pooled.

18  (<u>Id.</u>)  For every other class of milk, milk producers can decide

19  whether to participate in the pool.  (<u>Id.</u>)

20        FMMOs set the rules and conditions for producers

21  pooling milk.  (<u>Id.</u> ¶ 108.)  FMMOs consider many factors

22  including how much milk the producer "pooled" the previous month

23  and whether the producer diverted milk to other plants

24  participating in the pool.  (<u>Id.</u>)  Depending on that month's

25

26        [2]   While the court already discussed Milk Moovement's
    factual allegations as alleged in its Counterclaims and First
27  Amended Counterclaims, (Docket Nos. 105, 134), the Second Amended
    Counterclaims contain new factual allegations in support of Milk
28  Moovement's six new antitrust counterclaims.  The court takes the
    allegations of the Second Amended Counterclaims as true.

1   uniform price for milk, some producers will have to pay into the

2   pool while others will withdraw from the pool.  (Id. ¶ 106.)

3        Milk processors are required to submit monthly reports

4   detailing their total milk receipts by class and specifying how

5   much milk was pooled.  (Id. ¶ 109.)  Milk processors must also

6   send monthly reports to milk producers.  (Id.)  These reports

7   must include a variety of metrics including the total pounds of

8   milk received from that producer by date, the minimum payments

9   required to be made to the producer under the FMMOs, and the net

10  amount of payments to the producer. (Id.)  The USDA uses these

11  metrics to establish fixed minimum prices for milk and milk

12  products.  (Id. ¶ 110.)

13        Because producers try to obtain the highest possible

14  price for milk, they make pooling decisions based on whether the

15  market price for a particular class of milk is higher or lower

16  than the uniform price.  (Id. ¶ 107.)  Milk producers also try to

17  avoid paying into the pool.  (Id. ¶ 112.)  Because milk producers

18  are often organized into cooperatives,[3] not paying into the pool

19  allows a milk producer to use that money to pay member farms.

20  (Id.)  A cooperative only engaged in milk production is motivated

21  to obtain the highest price for milk.  (Id. ¶ 113.)

22        Historically, systems for tracking the dairy supply

23  chain used pen and paper and thus were inefficient and prone to

24  error.  (Id. ¶ 96.)  The advent of supply chain software in the

25  dairy industry, including data processing services, modernized

26  these systems.  (Id.)

27  _____

28        [3]  Milk cooperatives are entities owned by its farmer-
    members.

4

1    Dairy is the largest and most dominant provider of

2 dairy software.  (Id. ¶ 97.)  Dairy advertises on its website

3 that "over 80 percent of the 100 largest dairy companies in the

4 country are Dairy customers."  (Id. ¶ 81.)  Dairy was co-founded

5 by Dairy Farmers of America ("DFA"), which continues to have an

6 ownership interest.[4]  (Id. ¶ 94.)

7    DFA is the largest milk producer cooperative in the

8 country as well as an owner and operator of numerous milk

9 processors.  (Id. ¶ 94.)  As both a milk producer and processor,

10 DFA's interest in the price of milk differs from the typical milk

11 producer cooperative.  (Id. ¶ 114.)  Whereas milk cooperatives

12 benefit from the highest possible price for milk, DFA -- as a

13 milk processor -- benefits from lower milk prices.  (Id.)  When

14 DFA sells milk at a low price, it does not impact its net income

15 in the same way low prices impacts other milk producers because

16 DFA can recoup any losses through its profits as a milk

17 processor.  (Id. ¶ 117.)

18    DFA is Dairy's "most important customer."  (Id. ¶ 94.)

19 DFA will not work with any Dairy competitors.  (Id. ¶ 125.)  As a

20 partial owner of Dairy, DFA has access to the data of other milk

21 producers who utilize Dairy's software services.  (Id. ¶ 121.)

22 In prior litigation, a district court in Vermont found evidence

23 that DFA indeed accessed the data of competing milk cooperatives.

24 (Id. ¶¶ 119-20.)  Further, as the largest milk producer in the

25 country, DFA has the ability to manipulate FMMOs to suppress milk

26 prices.  (Id. ¶ 114.)  Because of DFA's access to other milk

27 _____

28    [4]   Dairy is also partially owned by the private equity
group, Banneker Partners.  (2d Am. Countercls. ¶ 95.)

1  producers' data and its ability to manipulate FMMOs, Dairy and

2  DFA have an incentive to block competitors in the dairy software

3  industry.  (Id. ¶ 122.)  Blocking competitors in the dairy

4  software industry allows Dairy to maintain and grow its dominance

5  in the dairy software industry.  In turn, Dairy grants DFA access

6  to the data of many of its competitors in the milk production and

7  milk processing industry.

8       Milk Moovement is a dairy software start-up and Dairy

9  competitor.  (Id. ¶ 97.)  Milk Moovement created new methods for

10 tracking and analyzing production data, including a cloud-based

11 software platform which connects all entities in the dairy supply

12 chain.  (Id. ¶ 97-98.)  Milk Moovement's software is used to keep

13 track of data such as how much and when milk is picked up from

14 producers.  (Id. ¶ 99.)  Its software allows its customers to

15 access data in-real time via computer or mobile app.  (Id. ¶¶ 99-

16 100.)

17      In 2020, Dairy -- through co-owner Banneker Partners --

18 attempted to acquire Milk Moovement.  (Id. ¶¶ 163-167.)  Dairy

19 had previously acquired two other entities: Data Specialists,

20 Inc. in 2018 and Ever.Ag in 2022.  (Id. ¶ 154.)  In addition,

21 Dairy also purchased a software system developed by a dairy

22 cooperative, United Dairymen of Arizona ("United Dairymen").

23 (Id. ¶ 155.)  However, Dairy never brought the software to

24 market.  (Id.)

25      Dairy has previously had relationships with other

26 entities in the dairy industry, including California Dairies,

27 Inc. ("California Dairies") -- a milk marketing and processing

28 cooperative in California.  (First Am. Compl. ¶ 32.)  In 2014,

1   California Dairies began using Dairy's software.  (Id. ¶ 33.)

2   Because of issues with Dairy's software, California Dairies then

3   entered into an agreement with Milk Moovement in or around

4   September 2021.  (Id. ¶ 37.)  California Dairies subsequently

5   gave Dairy notice that it was terminating its agreement effective

6   February 1, 2022.  (Id. ¶ 41.)  Dairy believes that California

7   Dairies shared Dairy's trade secrets with Milk Moovement when it

8   switched data processing service providers.  (Id. ¶¶ 42-46.)

9   That belief ultimately led Dairy to initiate this lawsuit in

10  December 2021 for various trade secrets violations.  (See Compl.

11  (Docket No. 1).)

12          The provisions in Dairy's contract with Milk Moovement

13  were not unique.  Rather, Dairy's contracts impose exclusivity

14  provisions on its customer which prevent the customers from

15  leaving Dairy for one of its competitors.  (2d Am. Countercls. ¶

16  138.)  These provisions convert a customer's raw data to into

17  Dairy trade secrets.  (Id. ¶¶ 139-143.)  As a result, customers

18  cannot disclose their own data as necessary to change service

19  providers.  (Id. ¶ 144.)  If a customer does decide to terminate

20  its relationship with Dairy, they would be unable to transfer its

21  own analytics and production data.  (Id. ¶ 145.)  This

22  information is critical to both the customer as well as the new

23  software provider.  (Id. ¶¶ 145-47.)  Moreover, these provisions

24  have the effect of precluding a customer from complying with

25  federal and state law relating to the historical accounting and

26  auditing of that customer's milk pooling and milk pricing

27  activities.  (Id. ¶ 148.)

28          In addition to Dairy's conduct preventing customers

1   from working with Milk Moovement, Dairy has also blocked Milk

2   Moovement from marketing opportunities.  In 2022, Dairy barred

3   Milk Moovement from attending, sponsoring, or presenting at

4   DairyTech -- the milk industry's leading annual technology

5   conference.  (Id. ¶ 191.)  The DairyTech is organized by the

6   International Dairy Foods Association.  (Id.)  When Milk

7   Moovement tried to become a sponsor of the event, a requirement

8   for appearing and presenting at the conference, the conference

9   organizers informed Milk Moovement that, due to the organizers'

10  partnership with Ever.Ag (Dairy's new trade name), any Ever.Ag

11  competitors were precluded as sponsors.  (Id. ¶ 193.)

12       Dairy's efforts against Milk Movement eventually led

13  Milk Movement to file its counterclaims against Dairy.  The court

14  will first address Dairy's motion to strike before addressing its

15  motion to dismiss the amended counterclaims.

16  II.  Motion to Strike

17       A.  Legal Standard

18       Federal Rule of Civil Procedure 12(f) authorizes the

19  court to "strike from a pleading an insufficient defense or any

20  redundant, immaterial, impertinent, or scandalous matter."  Fed.

21  R. Civ. P. 12(f).  See Ready Transp., Inc. v. AAR Mfg., Inc., 627

22  F.3d 402, 404 (9th Cir. 2010) (a district court's "inherent power

23  to control their docket . . . . includes the power to strike")

24  (holding district court has power to strike an improperly filed

25  confidential document) (citing Carrigan v. Cal. State

26  Legislature, 263 F.2d 560, 564 (9th Cir. 1959) (discussing an

27  appellate court's inherent power to strike briefs and pleadings

28  "as either scandalous, impertinent, scurrilous, and/or without

8

1  relevancy")) (additional citations omitted).  Because motions to

2  strike are "often used as delaying tactics," they are "generally

3  disfavored" and are rarely granted in the absence of prejudice to

4  the moving party.  Rosales v. Citibank, FSB, 133 F. Supp. 2d

5  1177, 1180 (N.D. Cal. 2001); see also N.Y.C. Emps.' Ret. Sys. v.

6  Berry, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) ("Where the

7  moving party cannot adequately demonstrate . . . prejudice,

8  courts frequently deny a motion to strike . . . .") (citation and

9  internal quotation marks omitted).

10      B.   Discussion

11          Milk Moovement filed its proposed Second Amended

12  Counterclaims attached as Exhibit 1 to its motion for leave to

13  amend.  (See Mot. Leave, Ex. 1 (Docket No. 204-3).)  The proposed

14  Second Amended Counterclaims included only Milk Moovement's

15  factual allegations and its six new antitrust related claims.

16  (See id.)  The proposed Second Amended Counterclaims did not

17  include Milk Moovement's answer, affirmative defenses, or prior

18  declaratory judgment counterclaims from its Counterclaims and

19  First Amended Counterclaims (Docket Nos. 79, 111), which survived

20  two motions to dismiss.  (See Docket Nos. 105, 134.)  After being

21  granted leave to amend by this court, Milk Moovement filed the

22  Second Amended Counterclaims, which incorporated its previously

23  filed answer, affirmative defenses, and declaratory judgment

24  counterclaims with the new factual allegations and six

25  counterclaims from the proposed Second Amended Counterclaims.

26  (Docket No. 249.)

27          Dairy moves to strike the Second Amended Counterclaims

28  by arguing that the "filing was inappropriate and objectively

1  unreasonable" because it "was substantively and materially

2  different" than the proposed counterclaims.  (Mot. Strike at 1

3  (Docket No. 270).)   Dairy contends that Milk Moovement's filing

4  of its Second Amended Counterclaims was a violation of Federal

5  Rules of Civil Procedure 15 and 16, Local Rules 137(c) and 220,

6  and the court's order granting Milk Moovement leave to amend.

7  (Id.)   Dairy asks that the court require Milk Moovement to either

8  proceed with the proposed counterclaims or proceed with the First

9  Amended Counterclaims, thereby abandoning its new antitrust

10  counterclaims.  (Mot. Strike at 16.)   The court will decline

11  Dairy's request.

12         As Milk Moovement explains: "Every single word in the

13  [Second Amended Counterclaims] was either (i) already part of the

14  case in the existing answer, defenses or claims, or (ii) the

15  Court had expressly authorized it to be added to the case by

16  granting leave to amend."  (Opp'n Mot. Strike at 3 (Docket No.

17  291).)   As discussed below, the court rejects all of Dairy's

18  arguments.   The court sees Dairy's motion to strike as simply a

19  second attempt to dismiss Milk Moovement's new antitrust

20  counterclaims in the event its concurrently filed motion to

21  dismiss (Docket No. 266) is unsuccessful.

22         First, Dairy argues that the court should strike the

23  Second Amended Counterclaims because they were filed in violation

24  of Local Rule 220, which states that "every pleading to which an

25  amendment or supplement is permitted as a matter of right or has

26  been allowed by court order shall be retyped and filed so that it

27  is complete in itself without reference to the prior or

28

superseded pleading."[5]   But the Second Amended Counterclaims, as filed, complies with Rule 220 as it contains Milk Moovement's answer, affirmative defenses, and counterclaims.[6]   See L.R. 220

Next, Dairy argues that the Second Amended Counterclaims violate the court's order granting Milk Moovement leave to amend under Rules 15 and 16 of the Federal Rules of Civil Procedure because Milk Moovement was not granted leave to file a "synthesized" pleading.[7]   (Mot. Strike at 11-13.)  Again, the court disagrees.  Unlike the cases upon which Dairy relies,[8]

---

[5]   It appears that Dairy is attempting to argue that Exhibit 1 attached to its leave to amend -- the proposed Counterclaims -- is a pleading.  However, as Milk Moovement points out, under Fed. R. Civ. P. 7(a), an exhibit is not a pleading.  See Fed. R. Civ. P. 7(a) (listing types of pleadings allowed, including a complaint, an answer, and an answer to a counterclaim designated as a counterclaim).

[6]   Dairy also points out that the filed Second Amended Counterclaims incorporate by reference earlier pleadings, specifically references to the First Amended Counterclaims.  (See Mot. Strike at 13-14.)  Milk Moovement explains that these were typographical errors that were supposed to reference the Second Amended Counterclaims.  (See Opp'n Mot. Strike at 11 n. 5).  While counsel is cautioned to avoid such basic errors, the court declines to find the pleading violated Rule 220 on the basis of a typographical error.

[7]   Dairy suggests that a "synthesized pleading" is a pleading which is a "synthesis" of the operative parts of other pleadings.  Thus, Dairy contends that Milk Moovement's Second Amended Counterclaims is a "synthesized pleading" as it contains the operative portions of Milk Moovement's Answer and First Amended Counterclaims as well as its proposed Second Amended Counterclaims.

[8]   The cases upon which Dairy relies in support of its motion to strike all involve instances where a party filed an amended pleading that greatly differed from the proposed pleading.  See e.g., Hazdovac v. Mercedez-Benz USA, LLC, No. 20-cv-00377 RS, 2022 WL 2161506, at *2 (N.D. Cal. June 15, 2022) ("The new [c]omplaint is littered with hundreds of changes compared to the proposed complaint, with paragraph after paragraph of new material in certain sections.").

11

the Second Amended Counterclaims include no new facts or claims
that were not already asserted in the First Amended Counterclaims
or proposed Second Amended Counterclaims.  Rather, the answer and
affirmative defenses included in the Second Amended Counterclaims
are identical to those in the First Amended Counterclaims.  Dairy
also argues that Milk Moovement abandoned the previously pled
declaratory judgment counterclaims because they were not included
in the proposed Second Amended Counterclaims.  To the extent
leave must be given to ensure the previously pled declaratory
judgment counterclaims are properly included in the Second
Amended Counterclaims, it is hereby granted.

Finally, Dairy argues that the court should strike the
Second Amended Counterclaims because they were filed in violation
of Local Rule 137(c).  Local Rule 137(c) provides: "If filing a
document requires leave of court, such as an amended complaint
after the time to amend as a matter of course has expire, counsel
shall attach the document proposed to be filed as an exhibit to
moving papers seeking such leave and lodge a proposed order as
required by these Rules."  L.R. 137(c).

Dairy is correct that Milk Moovement did not comply
with the precise requirements of Local Rule 137(c) because it
failed to incorporate its new counterclaims into its preexisting
answer, affirmative defenses, and declaratory judgment
counterclaims.  Nevertheless, the court declines Dairy's
invitation to strike the six new counterclaims where Dairy has
not adequately shown that it will be prejudiced.[9]  See Rosales,

---

[9]   Dairy argues it will be prejudiced because it "relied
upon the proposed [Second Amended Counterclaims] in deciding
whether to oppose and evaluating what arguments were available

12

1   133 F. Supp. 2d at 1180.

2            Moreover, to strike the Second Amended Counterclaims on

3   any procedural ground would be futile.  The court would strike

4   these counterclaims without prejudice, allowing Milk Moovement to

5   refile the exact same pleading as their currently filed Second

6   Amended Counterclaims.  Dairy would then refile their motion to

7   dismiss.  Thus, the case would be in the same position as it is

8   today, except having endured a months long delay.  The court

9   therefore declines to strike the six new counterclaims, which it

10  granted leave to amend, on a pure procedural technicality and for

11  which Dairy cannot honestly claim it will suffer any prejudice.

12           Dairy's motion is to strike is nothing more than a

13  disfavored delay tactic.  Such a motion is a waste of the court's

14  time and resources.  Accordingly, Dairy's motion to strike the

15  Counterclaims (Docket No. 270) is denied.

16  III. <u>Motion to Dismiss</u>

17       A.   <u>Legal Standard</u>

18           Federal Rule of Civil Procedure 12(b)(6) allows for

19  dismissal when the plaintiff's complaint fails to state a claim

20  _____

21  and should be made in opposition."  (Mot. Strike at 8.)  Dairy's
    argument is without merit.  At the hearing for Milk Moovement's
22  motion for leave to amend, Milk Moovement's counsel made clear
    its intentions to file one synthesized pleading which would
    contain its answer, affirmative defenses, and counterclaims.
23  Moreover, counsel for Milk Moovement again informed Dairy's
    counsel that it was going to file a synthesized pleading by email
24  prior to filing the Second Amended Counterclaims. (Opp'n Mot.
    Strike at 9.)  Nothing in the Second Amended Counterclaims was
25  new or a surprise to Dairy.  Finally, Dairy cannot argue that it
    will be prejudiced by having to defend itself against "new and
26  expansive antitrust claims."  <u>See</u> <u>Fru-Con Constr. Corp. v.</u>
    <u>Sacramento Mun. Util. Dist.</u>, No. CIV. S-05-583 LKK GGH, 2006 WL
27  3733815, at *5 (E.D. Cal. Dec. 15, 2006) (citation omitted) ("The
    fact that the amended counterclaim may cause more work does not
28  constitute prejudice.").

1  upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

2  "A Rule 12(b)(6) motion tests the legal sufficiency of a claim."

3  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  The inquiry

4  before the court is whether, accepting the allegations in the

5  complaint as true and drawing all reasonable inferences in the

6  plaintiff's favor, the complaint has alleged "sufficient facts

7  . . . to support a cognizable legal theory," id., and thereby

8  stated "a claim to relief that is plausible on its face," Bell

9  Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding

10  such a motion, all material allegations of the complaint are

11  accepted as true, as well as all reasonable inferences to be

12  drawn from them.  Id.

13       "In order to survive a motion to dismiss under Rule

14  12(b)(6), an antitrust complaint 'need only allege sufficient

15  facts from which the court can discern the elements of an injury

16  resulting from an act forbidden by the antitrust laws.'"  Cost

17  Mgmt. Servs. Inc. v. Washington Nat. Gas Co., 99 F.3d 937, 950

18  (9th Cir. 1996) (citation omitted).  "A motion to dismiss a

19  counterclaim brought pursuant to Rule 12(b)(6) is evaluated under

20  the same standard as motion to dismiss a plaintiff's complaint."

21  Niantic, Inc. v. Gobal++, 19-cv-03425 JST, 2020 WL 1548465, at *2

22  (N.D. Cal. Jan. 30, 2020).

23       B.   Relevant Market

24       As the first step in any antitrust action, a "plaintiff

25  must allege both that a relevant market exists and that the

26  defendant how power within that market."  Newcal Indus., Inc. v.

27  Ikon Office Sols., 513 F.3d 1038, 1044 (9th Cir. 2008).  See FTC

28  v. Qualcomm Inc., 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold

step in any antitrust case is to accurately define the relevant

market . . .") (citations omitted); <u>Netafirm Irrigation, Inc. v.</u>

<u>Jain Irrigation, Inc.</u>, 562 F. Supp. 3d 1073, 1081 (E.D. Cal.

2021) (Ishii, J.) (citations omitted) ("Setting the relevant

market boundaries is a critical first step as it enables the

court to assess issues regarding market share, defendant's

ability to lessen or destroy competition, and the alleged

antitrust injury.").

A 'market' is the group of sellers or produces who have

the 'actual or potential ability to deprive each other of

significant levels of business.'" <u>Rebel Oil Co. v. Atl.</u>

<u>Richfield Co.</u>, 51 F.3d 1421, 1434 (9th Cir. 1995) (citations and

quotation omitted). "The relevant market must include both a

geographic market and a product market." <u>Hicks v. PGA Tour,</u>

<u>Inc.</u>, 897 F.3d 1109, 1120 (9th Cir. 2019) (citation omitted).

1. <u>Product Market</u>

"[T]he [product] market must encompass the product at

issue as well as all economic substitutes for the product."

<u>Newcal</u>, 513 F.3d at 1045 (citation omitted). "The outer

boundaries of a product market are determined by the reasonable

interchangeability of use or the cross-elasticity of demand

between the product itself and substitutes for it." <u>Id.</u> (quoting

<u>Brown Shoe v. United States</u>, 370 U.S. 294, 325 (1962)). "The

analysis looks to both 'whether two products can be used for the

same purpose, and if so, whether and to what extent purchasers

are willing to substitute one for the other." <u>FTC v. Facebook,</u>

<u>Inc.</u>, 560 F. Supp. 3d 1, 17 (D.D.C. 2021) (citation omitted).

Here, Milk Moovement defines the relevant product

1  market as "the market for data services for milk producers and

2  processors."[10]   (2d Am. Countercls. ¶ 124.)   As Milk Moovement

3  explains, "both Dairy and Milk Moovement package their supply

4  chain data as integrated systems of software" for the dairy

5  industry.   (Opp'n Mot. Dismiss at 10.)   The dairy industry's

6  regulatory scheme limits the types of products which could offer

7  these services.[11]   See Verizon Commc'ns Inc. v. Law Offs. of

8  Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004) ("Antitrust

9  analysis must always be attuned to the particular structure and

10 circumstances or the industry at issue.   Part of that attention

11 to economic context is an awareness of the significance of

12 regulation.").   That both Dairy and Milk Moovement offer data

13 processing services for the dairy industry is sufficient to

14 define the product market at this stage.   See Thurman Indus.,

15 Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir.

16      [10]   Milk Moovement also alleges that the market for milk

17 production and the market for milk processing are additional
   relevant markets because DFA -- the largest milk producer and one

18 of the largest milk processors in the United States -- has an
   ownership interest in Dairy.   (2d Am. Countercls. ¶ 125.)

19

20      [11]   Dairy attempts to argue that Milk Moovement was
   required to specifically identify other competitors because "data

21 service providers" could include countless technology companies
   including Amazon's AWS and SAP.   (Mot. Dismiss at 16.)   The court

22 is unpersuaded.   While presumably any company that provides data
   services could build the capabilities to provide data processing

23 services for the dairy industry, the fact that they do not do so
   at this time means that they do not compete within the relevant

24 product market.   See Facebook, 560 F. Supp. 3d at 17 ("[T]he fact
   that other services are not primarily used for the sort of

25 personal sharing that is the hallmark of a [social media] service
   seems a plausible reason why little switching would occur.").

26 Moreover, "the question of whether the market should include
   other products is better resolved at the summary judgment stage."

27 Klein v. Facebook, Inc., 580 F. Supp. 3d 743, 765 (N.D. Cal.

28 2022) (citation and quotations omitted).

1  1989) ("The goods and services that sellers or producers offer

2  provide the best indicia of who competes in the same market.").

3  While identifying other competitors in the market would provide a

4  clearer picture of the market, particularly given Milk

5  Moovement's allegations that the market is heavily concentrated,

6  there is no requirement that Milk Moovement identify every

7  competitor.  See Klein, 580 F. Supp. 3d at 765 ("A plaintiff is

8  not required to identify every alleged competitor in its

9  pleadings.") (citation and internal quotations omitted).

10        Similarly, the court finds no issue with Milk

11  Moovement's limitation that the data services are "for milk

12  producers and processors."  Contrary to Dairy's argument, this

13  limitation describes the product, not the consumers.  See Brown

14  Shoe, 370 U.S. at 325 (a market "may be determined by examining

15  such practical indicia as . . . the product's peculiar

16  characteristics and uses . . . [and] distinct customers").

17  Accordingly, the court finds Milk Moovement has sufficiently pled

18  a relevant product market.

19        2.   Geographic Market

20        "The geographic market extends to the area of effective

21  competition where buyers can turn for alternative sources of

22  supply."  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th

23  Cir. 2011) (citations and internal punctuation omitted).  There

24  are two ways that courts define a geographic market: (1) the

25  location of the relevant suppliers, which "must include all the

26  firms with the relevant production, sales, or service facilities

27  in the specific region"; or (2) the location of the relevant

28  customers, which must include "all the firms that sell to

17

customers in the geographic region, regardless of the location of the supplier making those sales." Pacific Steel Grp. v. Com. Metals Co., 600 F. Supp. 3d 1056, 1068 (N.D. Cal. 2022) (citing 2010 Dep't of Justice and FTC Horizontal Merger Guidelines §§ 4.2.1, 4.2.2).

Here, Milk Moovement defines the geographic market as the United States or, in the alternative, the sub-national regions for milk purchasing established by the USDA: Northeast, Appalachian, Florida, Southeast, Upper Midwest, Central, Midwest, California, Pacific Northwest, Southwest, and Arizona.  (2d Am. Countercls. ¶ 126-27.)

At this stage, the court finds both geographic markets are sufficiently pled.  The dairy industry is heavily regulated by the federal government.  Thus, while Milk Moovement and Dairy both operate overseas, federal regulation determines the geographic boundaries in which milk producers and processors must operate.  Further, the FMMO system does not apply outside of the United States.  Cf. Brown Shoe, 370 U.S. at 336-37 ("The geographic market selected must . . . correspond to the commercial realities of the industry . . . .") (internal quotations omitted).  The court finds it plausible that industry regulations control whether one sub-region could turn to another for alternative supply.  Accordingly, the court finds Milk Moovement has sufficiently pled a relevant geographic market.

Because Milk Moovement has plausibly defined both a relevant product market and a relevant geographic market, it has sufficiently pled a relevant market at this stage.  See Newcal, 513 F.3d at 1045 ("[Because] the validity of the 'relevant

18

market' is typically a factual element, alleged markets may
survive scrutiny under Rule 12(b)(6) subject to factual testing
by summary judgment or trial.") (citations omitted); Netafirm,
562 F. Supp. 3d at 1081 (relevant market allegations are often
able to survive scrutiny under Rule 12(b)(6) because "relevant
market determinations are typically fact-intensive, with actual
inquiry into the commercial realities faced by consumers")
(citations and internal quotations omitted).

C.   Market Power

"Along with a relevant market definition, a plaintiff
must plead that the defendant has power within that market."
Netafirm, 562 F. Supp. 3d at 1085 (citing Newcal) (additional
citations omitted).  "The essence of market power is a firm's
'ability to raise prices profitably by restricting output.'"
Pacific Steel, 600 F. Supp. 3d at 1072 (quoting Ohio v. Am.
Express Co., 138 S. Ct. 2274, 2288 (2018)).  "[Courts] rely on
market power to help distinguish between restraints that are
likely to substantially impair competition and those that are
not."  Flaa v. Hollywood Foreign Press Ass'n, 55 F.4th 680, 693
(9th Cir. 2022) (citations omitted).  "A plaintiff may prove that
a restraint has anticompetitive effect either 'directly or
indirectly."  Qualcomm, 969 F.3d at 989 (quoting Am. Express, 138
S. Ct. at 2284).

1.   Direct Evidence

"Direct evidence includes proof of actual detrimental
effects on competition, such as reduced output, increased prices,
or decreased quality in the relevant market."  Qualcomm, 969 F.3d
at 989 (citations and internal quotations omitted).  Here, Milk

1    Moovement alleges that Dairy "charge[s] supracompetitive prices

2    and wrongly restricts customers' ability to freely choose their

3    service providers." (2d Am. Countercls. ¶ 136.) Milk Moovement

4    further alleges that Dairy "is able to charge [their]

5    supracompetitive prices to its customers even while it provides

6    poor, lackluster service." (Id. ¶ 137.)

7            In support of these allegations, Milk Moovement refers

8    to documents produced in discovery which purport to show that:

9    there were significant problems with Dairy's software that went

10   uncorrected for years; Dairy did not have the software capacity

11   that at least one customer, California Dairies, required; Dairy

12   sought to charge California Dairies an additional $120,000 to

13   provide the requested services; and Dairy's CEO not only knew

14   about Dairy's failure to provide these services but also thought

15   that charging for such services should be Dairy's standard

16   practice. (2d Am. Countercls. ¶¶ 169, 172, 176.)

17           Milk Moovement further alleges that the various

18   exclusivity provisions in Dairy's customer contracts meant that

19   any customer seeking to leave Dairy "would be forced to leave

20   behind years of its own analytics and production data --

21   information that Dairy knows forms the lifeblood of strategic

22   decision making in the industry." (2d. Am. Countercls. ¶ 145.)

23   Not only would such provisions deter any customer from leaving

24   Dairy, but they would also deny any Dairy competitor "the

25   functionality necessary to permit an 'apples to apples'

26   comparison between different time periods."[12] (Id. ¶ 146.)

27   _____

28           [12]  Dairy argues that the fact California Dairies left
     Dairy after Dairy tried to charge a higher price shows that Dairy

1  Because its customers were barred from leaving, Dairy could

2  provide lower quality services.  See Qualcomm, 969 F.3d at 989.

3            2.   Circumstantial Evidence

4            "To demonstrate market power circumstantially, a

5  plaintiff must: (1) define the relevant market, (2) show that the

6  defendant owns a dominant share of that market, and (3) show that

7  there are significant barriers to entry and show that existing

8  competitors lack the capacity to increase their output in the

9  short run." Rebel Oil, 51 F.3d at 1434 (citations omitted).  As

10 discussed above, Milk Moovement has sufficiently defined the

11 relevant market.

12            i.   Market Share

13            "Measurement of market share is necessary to determine

14 whether the defendant possesses sufficient leverage to influence

15 marketwide output." Rebel Oil, 51 F.3d at 1437; see Pacific

16 Steel, 600 F. Supp. 3d at 1073 ("[A] dominant share of the market

17 often carries with it the power to control output across the

18 market and in so doing control prices.") (citing Image Tech

19 Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir.

20 1997)).  Generally, a 65 percent market share is sufficient to

21 establish a prima facie case of market power.  Optronic Techs.,

22 Inc. v. Ningbo Sunny Elec. Co., 20 F.4th 466, 484 (9th Cir. 2021)

23 (citation omitted).  A lower market share is permissible for

24 claims of attempted monopolization.  See Rebel Oil, 51 F.3d at

25 _____

26 could not in fact charge supracompetitive prices.  (See Mot.
   Dismiss at 26.)  Dairy, however, chooses to look at the factual

27 allegations only in isolation.  While California Dairies did
   leave Dairy for Milk Moovement, doing so led Dairy to initiate

28 this action.

                            21

1   1438 (finding 44 percent sufficient in an attempted

2   monopolization case).

3          Here, Milk Moovement alleges that Dairy's market share

4   exceeds 80 percent because, as Dairy advertises on its website,

5   "over 80 percent of the 100 largest dairy companies in the

6   country are Dairy.com customers."  (2d. Am. Countercls. ¶ 134.)

7   The court shares Dairy's concerns that Milk Moovement appears to

8   have premised its market share allegation solely upon this 80

9   percent figure.  However, plaintiffs are not required to plead

10  market share with specificity or to explain how they arrived at

11  their market share allegation.  See United Energy Trading, LLC v.

12  Pac. Gas & Elec., 200 F. Supp. 3d 1012, 1020 (N.D. Cal. 2016)

13  (finding sufficient an alleged market share of 70 to 90 percent);

14  Teradata Corp. v. SAP SE, No. 18-cv-03670 WHO, 2018 WL 6528009,

15  at *19 (N.D. Cal. Dec. 12, 2018) (finding sufficient an alleged

16  market share of 60 to 90 percent "on information and belief").

17  Moreover, Dairy's arguments that Milk Moovement's market share

18  allegation is insufficient are predominately factual and thus not

19  suitable at the motion to dismiss stage.[13]  Because a market share

20  of above 80 percent is more than sufficient to establish market

21  power, see Optronic, 20 F.4th at 484, Milk Moovement has

22  sufficiently alleged market power at this stage.

23                    ii.  Entry Barriers

24          "Market power cannot be inferred solely from a dominant

25  market share."  Pacific Steel, 600 F. Supp. 3d at 1073 (citation

26  ──────────────
        [13]   Dairy further argues that Milk Moovement failed to
27  offer an explanation as to why the 80 percent figure is relevant
    to relevant geographic markets when three of the top ten
    companies on the list of the 100 largest dairy companies have
28  locations outside of the United States.  (Mot. Dismiss at 23.)

omitted).  "The plaintiff must show that new rivals are barred
from entering the market and show that existing competitors lack
the capacity to expand their output to challenge the predator's
high price."  Rebel Oil, 51 F.3d at 1439 (citation omitted).
"Entry barriers are 'additional long-run costs that were not
incurred by incumbent firms but must be incurred by new
entrants,' or 'factors in the market that deter entry while
permitting incumbent firms to earn monopoly returns.'"  Id. at
1439 (citation omitted).

        "In evaluating entry barriers, we focus on their
ability to constrain not those already in the market, but . . .
those who would enter but are prevented from doing so."  Id. at
1439 (citation and internal quotation omitted).  "The fact that
entry has occurred does not necessarily preclude the existence of
'significant' entry barriers. . . .  Barriers may still be
'significant' if the market is unable to correct itself despite
the entry of small rivals."  Id. at 1440.

        "The main sources of entry barriers are: (1) legal
license requirements; (2) control of an essential or superior
resource; (3) entrenched buyer preferences for established
brands; (4) capital market evaluations imposing higher capital
costs on new entrants; and, in some situations, (5) economies of
scale."  Id. at 1439 (citations omitted).  See e.g., id. at 1439-
40 (municipal regulations and state laws regarding oil and gas
are entry barriers); United Energy, 200 F. Supp. 3d at 1021-23
(regulations regarding natural gas are entry barriers); Pacific
Steel, 600 F. Supp. 3d at 1074 (environmental regulations, cost
and time, and complexity involved in building and operating a

1   steel mill are entry barriers); Klein, 580 F. Supp. 3d at 779

2   (the switching costs between social media networks are entry

3   barriers).

4           Here, Milk Moovement alleges that there are substantial

5   barriers to entry in the market for data services for milk

6   producers and processors.  Because the milk industry is heavily

7   regulated, it is both more complicated and costly for new

8   entrants to comply with those regulations than an existing

9   competitor.  (2d. Am. Countercls. ¶ 129.)  Milk Moovement also

10  alleges that Dairy has created multiple barriers including: (1)

11  Dairy's de facto exclusive contracts, which restrict new entrants

12  to the market; (2) Dairy's customer-owner relationship with DFA,

13  the largest milk producer and one of the largest milk processors

14  in the country; and (3) Dairy's confidentiality provisions, which

15  frustrate a new entrant's ability to speak with a potential

16  customer about their user requirements and data.  (Id. ¶ 129-

17  132.)  Milk Moovement has thus alleged facts which plausibly show

18  that Dairy charges supracompetitive prices, restricts customers

19  from choosing their dairy data service provider, has a market

20  share of over 80 percent, and has created multiple barriers to

21  entry.

22          For the reasons stated above, the court finds Milk

23  Moovement has sufficiently alleged both direct and circumstantial

24  evidence showing anticompetitive restraint.  Accordingly, Milk

25  Moovement has sufficiently pled that Dairy has market power

26  within the relevant market.  The court will next address Milk

27  Moovement's various antitrust claims.

28          D.   Sherman Act § 2

1           Section 2 of the Sherman Act provides: "Every person

2     who shall monopolize, or attempt to monopolize, or combine or

3     conspire with any other person or persons, to monopolize any part

4     of the trade or commerce among the several States, or with

5     foreign nations, shall be deemed guilty . . . ." 15 U.S.C. § 2.

6     Here, Milk Moovement asserts two claims under § 2 of the Sherman

7     Act: conspiracy to monopolize (Claim 5) and monopolization and

8     attempted monopolization (Claim 6).

9           1.   Antitrust Injury

10          "A plaintiff may only pursue an antitrust action if it

11    can show 'antitrust injury, which is to say injury of the type

12    the antitrust laws were intended to prevent and that flows from

13    that which makes defendants' acts unlawful.'"  Am. Ad. Mgmt, Inc.

14    v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1055 (9th Cir. 1999)

15    (citations and internal quotations omitted).  "[C]onduct that

16    eliminates rivals reduces competition.  But reduction of

17    competition does not invoke the Sherman Act until it harms

18    consumer welfare."  Rebel Oil, 51 F.3d at 1433 (citations

19    omitted).  "[A] causal antitrust injury is a substantive element

20    of an antitrust claim, and the fact of injury or damage must be

21    alleged at the pleading stage."  Somers v. Apple, Inc., 729 F.3d

22    953, 963 (9th Cir. 2013).

23          An antitrust injury consists of five elements: "(1)

24    unlawful conduct, (2) causing an injury to the plaintiff, (3)

25    that flows from that which makes the conduct unlawful, . . . (4)

26    that is of the type that the antitrust laws were intended to

27    prevent,' and (5) 'the injured party [is] a participant in the

28    same market as the alleged malefactors."  Id. (citation omitted).

25

1   "There can be no antitrust injury if the plaintiff stands to gain

2   from the alleged unlawful conduct."  Am. Ad., 190 F.3d at 1056

3   (citation omitted); see Reveal Chat Holdco, LLC v. Facebook,

4   Inc., 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) ("An increase in

5   market prices, 'though harmful to competition, actually

6   benefit[s] competitors.'") (quoting Matsushita Elec. Indus. Co.

7   v. Zenith Radio Corp., 475 U.S. 574, 583 (1986)).

8          Courts have recognized various types of antitrust

9   injuries, including limiting consumer choice, reducing output and

10  innovation, and increasing prices for lower quality and fewer

11  services.  See e.g., Glen Holly Ent., Inc. v. Tektronix Inc., 343

12  F.3d 1000, 1011 (9th Cir. 2003) ("One form of antitrust injury is

13  '[c]oercive activity that prevents its victims from making free

14  choices between market alternatives.'") (citation omitted);

15  Klein, 580 F. Supp. 3d at 804 ("[Plaintiffs] have suffered an

16  injury because Facebook 'detrimentally changed the market make-up

17  and limited consumers' choice to one source of output.'")

18  (citation omitted); In re Juul Labs Labs, Inc. Antitrust Litig.,

19  555 F. Supp. 3d 932, 959 (N.D. Cal. 2021) (antitrust injury

20  plausible where plaintiff asserted allegations of

21  "supracompetitive process, reduced output, and reduced

22  innovation"); Sumotext Corp. v. Zoove, Inc., No. 16-cv-01370 BLF,

23  2017 WL 2774382, *10 (N.D. Cal. 2017) (allegations that customers

24  "have been forced to pay supracompetitive prices while receiving

25  lower quality and few services with more onerous and adhesive

26  contract terms" and that the market has suffered "price

27  increases, lower quality products, and few market alternatives"

28  are sufficient to plead antitrust injury at the motion to dismiss

26

1  stage).

2        Here, Milk Moovement alleges that Dairy's

3  anticompetitive scheme included locking customers into de facto

4  exclusive contracts, unlawfully acquiring competitors, and

5  barring Milk Moovement from marketing opportunities.  (2d Am.

6  Countercls. ¶¶ 140-43, 151-67, 193.)  Milk Moovement further

7  alleges that "Dairy's conduct has inhibited Milk Moovement and

8  other competitors from entering the market and deterred customers

9  from freely switching service providers, all of which has

10  increased prices, decreased consumer choice, and resulted in

11  worse services than would otherwise exist."  (Id. ¶ 168.)

12        Dairy's arguments that Milk Moovement failed to

13  plausibly allege antitrust injury are unpersuasive.  First, Dairy

14  contends that any claims concerning its 2015 purchase of United

15  Dairymen's software system and the 2018 acquisition of Data

16  Specialists, Inc. are barred by the statute of limitations.  (See

17  Mot. Dismiss at 28-29.)  Milk Moovement's antitrust claims all

18  have a four-year statute of limitations.  See 15 U.S.C. § 15b

19  (Sherman Act and Clayton Act); Cal. Bus. & Prof. Code § 16750.1

20  (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL).  The fact

21  that some acquisitions occurred outside the four-year statute of

22  limitations does not mean that Milk Moovement has failed to

23  plausibly allege antitrust injury at this stage.  Moreover, Milk

24  Moovement notes that while only the 2022 acquisition of Ever.Ag

25  can give rise to damages, there is no statute of limitations for

26  injunctive relief claims under Section 16 of the Clayton Act.

27  (Opp'n Mot. Dismiss at 24.)  Thus, if the time-barred acquisition

28  is found to violate antitrust laws, Dairy can be ordered to

27

1   divest that acquisition.  <u>See</u> <u>California v. Am. Stores Co.</u>, 495

2   U.S. 271, 282 (1990) ("[T]he plain text of § 16 [of the Clayton

3   Act] authorizes divestiture decrees to remedy § 7 violations.").

4           The court likewise rejects Dairy's argument that Milk

5   Moovement failed to plausibly allege that the companies Dairy

6   acquired were "competitors" of Dairy.  (<u>See</u> Mot. Dismiss at 29-

7   31.)  For example, the press releases which explain how the

8   acquisitions were intended to further develop Dairy's services

9   plausibly suggest that the acquisitions were of competitors.[14]

10  (<u>See</u> Opp'n Mot. Dismiss at 24-25 (Docket No. 289).)  Dairy's

11  arguments to the contrary involve factual determinations and

12  therefore are not appropriate at the motion to dismiss stage.[15]

13          Milk Moovement has alleged facts showing that Dairy's

14

15      [14]  The press release announcing the acquisition of Data
    Specialists stated that the "[Data Specialists] manufacturing
16  suite" was "a powerful solution that handles complex in-plant
    processing, further extending Dairy.com traceability capabilities
17  across the supply chain."  (Opp'n Mot. Strike at 24-25.)  The
    press release for the Ever.Ag acquisition was similar: "[Dairy
18  is] now even more capable of supporting the connected supply
    chain and ultimately empowering it to feed a growing world."
19  (<u>Id.</u> at 25.)

20

21      [15]  In addition to arguing that Milk Moovement failed to
    allege that the acquisitions were of competitors, Dairy argues
22  that (1) Milk Moovement failed to plead that it suffered a
    legally cognizable antitrust injury because Milk Moovement stood
23  to gain from the alleged increase in prices, (2) Milk Moovement's
    allegations that Dairy had an inferior product in fact created
24  Milk Moovement's business opportunity, (3) contractual
    restrictions in software and grant-base licenses are reasonable,
25  and (4) enforcement of contractual rights is entitled to <u>Noerr-
    Pennington</u> protection. (Mot. Dismiss at 32-34.)  The <u>Noerr-
26  Pennington</u> doctrine "provides that those who petition any
    department of the government for redress," including the judicial
27  branch, "are generally immune from statutory liability for their
    petitioning conduct."  <u>B&G Foods N. Am., Inc. v. Embry</u>, 29 F.4th
    527, 535 (9th Cir. 2022).
28

1    conduct, including acquisition of competitors and exclusive

2    contracts, prevented Milk Moovement from growing in the market

3    for dairy data processing services, limited consumer choice, and

4    increased prices.  The court therefore finds that Milk Moovement

5    has sufficiently alleged antitrust injury.

6              2.  Conspiracy to Monopolize (Claim 5)

7              To state a claim for conspiracy to monopolize under § 2

8    of the Sherman Act, a plaintiff must show: "(1) an agreement or

9    understanding [alleged conspirators]; (2) a specific intent to

10   monopolize; and (3) overt acts in furtherance of the alleged

11   conspiracy." Optronic, 20 F.4th at 482 (citation and internal

12   quotations omitted).

13             Here, Milk Moovement alleges that Dairy and DFA

14   conspired to monopolize the relevant market by virtue of their

15   customer-owner relationship, DFA's refusal to work with Dairy's

16   competitors in the dairy data processing market, and DFA's

17   ability to restrict competition in the milk production market by

18   suppressing milk prices.  (2d Am. Countercls. ¶ 223.)

19             Contrary to Dairy's argument, the court does not read

20   Milk Moovement's counterclaim as advancing a "shared monopoly"[16]

21   theory because DFA does not operate in the relevant market.  See

22   Standfacts Credit Servs. Inc., v. Experian Info. Sol., 405 F.

23   Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of

24   conspiracy to create a shared monopoly does not plead a claim of

25   conspiracy under section 2.") (citation omitted); see also United

26

27        [16]   A "shared monopoly" is an oligopoly.  See Consol.
     Terminal Sys. Inc., v. ITT World Comms., Inc., 535 F. Supp. 225,
28   228-29 (S.D. N.Y. 1982).

1  Food & Com. Workers Local 1776, et al. v. Teikoku Pharma USA,

2  Inc., 74 F. Supp. 3d 1052, 1076 (N.D. Cal. 2014) ("A monopoly, by

3  definition, consists of a single firm, and both monopolization

4  and attempted monopolization are single-firm violations[.]")

5  (citation omitted).

6          Rather, Milk Moovement's allegations plausibly show

7  that Dairy and DFA "conspired to endow" Dairy with market power

8  in the data processing market.  See United Food, 74 F. Supp. 3d

9  at 1077 (dismissing claim because complaint "d[id] not allege

10 that the parties conspired to endow either [party] with market

11 power").  Milk Moovement's theory is that DFA's suppression of

12 milk prices prevents other milk producers from entering or

13 growing in the market for milk production.  This limits the

14 number of milk producers who could seek data processing services

15 from a Dairy competitor.  The limited number of milk producers

16 thus blocks data processing companies from entering and growing

17 in the relevant market.  Dairy thus "leverage[s] [its] monopoly

18 to prevent other market participants . . . from reaching scale as

19 a viable competitor."  (Id. ¶ 223.)  Accordingly, the court finds

20 that Milk Moovement has alleged facts sufficient to support a

21 claim for conspiracy under § 2 of the Sherman Act.

22          2.   Monopolization and Attempt (Claim 6)

23          Milk Moovement also asserts a claim for monopolization

24 and attempted monopolization under § 2 of the Sherman Act.  To

25 state a claim for monopolization under § 2 of the Sherman Act, "a

26 plaintiff must show: (a) the possession of monopoly power in the

27 relevant market; (b) the willful acquisition or maintenance of

28 that power, and (c) causal antitrust injury."  Qualcomm, 969 F.3d

1  at 990 (internal quotations and citations omitted); see also

2  Verizon, 540 U.S. at 878-79 ("[T]he willful acquisition or

3  maintenance of [monopoly] power . . . distinguishe[s] [power]

4  from growth or development as a consequence of a superior

5  product, business acumen, or historic accident.") (citation and

6  quotation omitted).

7         To state a claim for attempted monopolization under §

8  2, a plaintiff must show: "(1) specific intent to control prices

9  or destroy competition; (2) predatory or anticompetitive conduct

10 to accomplish the monopolization; (3) dangerous probability of

11 success; and (4) causal antitrust injury." Cost Mgmt. Servs.,

12 Inc. v. Wash. Nat. Gas Co., 99 F.3d 937, 949-50 (9th Cir. 1996);

13 see also Optronic, 20 F.4th at 481-82. "A plaintiff may

14 establish specific intent to monopolize through either direct

15 evidence of unlawful design or circumstantial evidence

16 principally of illegal conduct." Optronic, 20 F.4th at 483

17 (citation and internal quotations omitted).

18        For reasons similar to those already discussed, the

19 court finds Milk Moovement plausibly alleges its claim for

20 monopolization and attempted monopolization under § 2. Milk

21 Moovement alleges that Dairy acquired competitors and used

22 exclusivity contracts to prevent customers from leaving Dairy to

23 work with its competitors. (2d. Am. Countercls. ¶¶ 138-45, 151-

24 55.) Such allegations are sufficient to show that Dairy both

25 acquired and maintained monopoly power as well as acted with the

26 specific intent to destroy competition. Moreover, Milk

27 Moovement's allegation of Dairy's market share is sufficient to

28 show that Dairy had a high probability of success in monopolizing

1   the market.  See Cost Mgmt., 99 F.3d at 949-50.  Accordingly,

2   Milk Moovement has alleged facts sufficient to support a claim

3   for monopolization and attempted monopolization under § 2 of the

4   Sherman Act.

5        E.   Sherman Act § 1 (Claim 7)

6            In addition to its § 2 conspiracy claim, Milk Moovement

7   asserts a conspiracy claim under § 1 of the Sherman Act.

8   "Section 1 'targets concerted anticompetitive conduct, [whereas]

9   [Section 2] targets independent anticompetitive conduct.'"

10  Optronic, 20 F.4th at 481 (citation omitted).  Section 1 of the

11  Sherman Act provides: "Every contract, combination in the form of

12  trust or otherwise, or conspiracy, in restraint of trade or

13  commerce among the several States, or with foreign nations, is

14  declared to be illegal."  15 U.S.C. § 1.[17]  To state a claim under

15  § 1, a plaintiff must show: "(1) a contract, combination or

16  conspiracy; (2) 'that unreasonably restrained trade . . . ; and

17  (3) that restraint affected interstate commerce.'"  Optronic, 20

18  F.4th at 479 (citation omitted).

19           Here, the court finds Milk Moovement's allegations are

20  sufficient to support a conspiracy claim under § 1.  Milk

21  _____

22       [17]  "Although on its face, Section 1 appears to outlaw
     virtually all contracts, it has been interpreted as 'outlaw[ing]
     only unreasonable restraints' of trade."  In re Nat'l Football
23   League's Sunday Ticket Antitr. Lit., 933 F.3d 1136, 1149-50 (9th
     Cir. 2019) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10
24   (1997)).  "Because § 1 . . . only [prohibits] restraints effected
     by a contract, combination, or conspiracy, the crucial question
25   is whether the challenged anticompetitive conduct stems from an
     independent decision or from an agreement, tacit or express."
26   Twombly, 550 U.S. at 553 (citations and internal quotations
     omitted); see Optronic, 20 F.4th at 479 ("To establish a
27   conspiracy, the available evidence must tend 'to exclude the
     possibility that the alleged conspirators acted independently.'")
28   (citation and internal quotations omitted).

Moovement alleges that DFA is both a co-founder and owner of
Dairy and will not work with Dairy's competitors.  (2d. Am.
Countercls. ¶ 94.)  As both a milk producer and milk processor,
DFA is not only motivated to suppress milk prices, but also their
market share in fact enables it to manipulate FMMOs and milk
prices.  (Id. ¶ 114.)  Moreover, Milk Moovement alleged that
evidence produced in prior litigation showed DFA had accessed
competing producers' pricing data in an effort to manipulate milk
prices.  (Id. ¶ 120.)  By allegedly suppressing milk prices, DFA
prevents other milk producers, who may seek data processing
services from a Dairy competitor, from growing in the market for
milk production.  As a result, Dairy can "leverage [its] monopoly
to prevent other market participants . . . from reaching scale as
a viable competitor."  (Id. ¶ 223.)

     The court finds these allegations constitute "enough
fact to raise a reasonable expectation that discovery will reveal
evidence of illegal agreement."  Name.Space, Inc. v. Internet
Corp. for Assigned Names & Numbers, 795 F.3d 1124, 1129 (9th Cir.
2015) (quoting Twombly, 550 U.S. at 556).  Accordingly, Milk
Moovement has alleged facts sufficient to support a claim for
conspiracy to monopolize under § 1 of the Sherman Act.

     F.   Cartwright Act (Claim 8)

     Milk Moovement also asserts a claim under California's
Cartwright Act.  The Cartwright Act is California's antitrust
law.  See Cal. Bus. & Prof. Code §§ 16700 et seq.  The Cartwright
Act "bans agreements that 'prevent competition in . . . [the]
sale or purchase of . . . any commodity.'"  Pacific Steel, 600 F.
Supp. 3d at 1080 (quoting Cal. Bus. & Prof. Code § 16720(c)).

33

1  The inquiry under the Cartwright Act is similar to that under

2  Section 1 of the Sherman Act.  See Jain Irrigation, Inc. v.

3  Netafirm Irrigation, Inc., 386 F. Supp. 3d 1308, 1314 (E.D. Cal.

4  2019) (Drozd, J.) ("[T]he analysis under [the Cartwright Act]

5  'mirrors the analysis under Federal Law because the Cartwright

6  Act . . . was modeled after the Sherman Act.") (quoting Cnty of

7  Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir.

8  2001)) (additional citation omitted).  Here, as already

9  discussed, Milk Moovement has alleged facts sufficient to support

10  a claim under § 1 of the Sherman Act.  Accordingly, it has also

11  sufficiently alleged its claim under the Cartwright Act.

12      G.   Clayton Act § 7 (Claim 9)

13          Milk Moovement asserts a claim for unlawful mergers and

14  acquisitions under § 7 of the Clayton Act.  "Section 7 [of the

15  Clayton Act] prohibits mergers that tend 'substantially to lessen

16  competition' or 'create a monopoly.'"  Optronic, 20 F.4th at 485

17  (citing 15 U.S.C. § 18).  "To establish a prima face [Section 7]

18  case, [a plaintiff] must (1) propose the proper relevant market

19  and (2) that that the effect of the merger in that market is

20  likely to be anticompetitive."  Id. (citation and quotations

21  omitted); see Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint

22  Luke's Health Sys. Ltd., 778 F.3d 775, 788 (9th Cir. 2015)

23  ("Section 7 does not require proof that a merger or other

24  acquisition has caused higher prices in the affected market.  All

25  that is necessary is that the merger create an appreciable danger

26  of such consequences in the future.") (citation and quotations

27  omitted).  "[T]he anticompetitive effect of [a] merger is further

28  enhanced by high barriers to market entry."  FTC v. H.J. Heinz

1    Co., 246 F.3d 708, 718 (D.C. Cir. 2001) (explaining that high

2    barriers to entry "eliminates the possibility that the reduced

3    competition caused by the merger will be ameliorated by new

4    competition from outsiders"); see also Saint Alphonsus Med., 778

5    F.3d at 788.

6         Here, Milk Moovement alleges that Dairy's various

7    acquisitions of competing supply-chain software products and

8    services, including of Data Specialists, Inc. and Ever.Ag,

9    "substantially lessened competition in the market for data

10   services to milk producers and processors in the United States .

11   . . ." (2d Am. Countercls. ¶ 258.)  Moreover, Milk Moovement

12   alleges that Dairy terminated competition through acquisitions by

13   purchasing United Dairymen's competing software system, but never

14   bringing it to market.  (Id. ¶ 155.)

15        As already discussed, Milk Moovement has sufficiently

16   pled a relevant market.  The court also found plausible Milk

17   Moovement's allegations that the relevant market has high

18   barriers to entry, that Dairy's market power exceeds 80 percent,

19   and that the companies Dairy acquired were competitors.  Because

20   these acquisitions limit the amount of available software

21   providers in a market with high entry barriers, see H.J. Heinz

22   Co., 246 F.3d at 718, the court finds it plausible that these

23   acquisitions further concentrate an already concentrated market.

24   Thus, the effect of the acquisitions "is likely to be

25   anticompetitive." See Optronic, 20 F.4th at 485.  Accordingly,

26   Milk Moovement has alleged facts sufficient to support a claim

27   under § 7 of the Clayton Act.

28        H.   UCL (Claim 10)

                                35

1        Finally, Milk Moovement asserts a claim under

2 California's UCL.  "California's UCL[] prohibits 'any unlawful,

3 unfair, or fraudulent business act or practice.'  This cause of

4 action is generally derivative of some other illegal conduct or

5 fraud . . .").  Castaneda v. Saxon Mortg. Servs., Inc., 687 F.

6 Supp. 2d 1191, 1202 (E.D. Cal. 2009) (Shubb, J.) (quoting Cel-

7 Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163,

8 187 (1999)).  Here, Milk Moovement's asserts its UCL claim for

9 Dairy's alleged violations of the Sherman Act and Clayton Act.

10 (Id. ¶ 263.)  Because Milk Moovement has adequately pled its

11 antitrust claims, it has also adequately pled its unfair

12 competition claim.  See Name.Space, 795 F.3d at 1134 ("Statutory

13 liability can be premised on antitrust or trademark

14 violations.").

15        For the reasons stated above, the court finds that Milk

16 Moovement has plausibly alleged facts sufficient to support its

17 counterclaims for conspiracy to monopolize under § 2 of the

18 Sherman Act, monopolization and attempted monopolization under §

19 2 of the Sherman Act, unlawful restraint of trade under § 1 of

20 the Sherman Act, unlawful restraint of trade under California's

21 Cartwright Act, unlawful mergers or acquisitions under § 7 of the

22 Clayton Act, and unfair competition under California's UCL.

23        IT IS THEREFORE ORDERED that Dairy's motion to strike

24 (Docket No. 270) and motion to dismiss (Docket No. 266) be, and

25 the same hereby are, DENIED.

26 Dated:  May 12, 2023

27 WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

28

36